**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**RIK SARGENT,**

       **Petitioner,**

**vs.**                                      **Case No. 4:08cv175-SPM/WCS**

**WALTER A. McNEIL,**

       **Respondent.**

_____/


**REPORT AND RECOMMENDATION**

Petitioner filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 which remains pending. Doc. 1. Respondent filed a motion to dismiss the petition as untimely, Petitioner filed a reply, and the motion to dismiss was denied. Docs. 5, 7, 9, and 11. Respondent filed an answer. Doc. 14.[1] Petitioner filed a reply with exhibits. Docs. 14 and 15.

Upon review of the record, counsel was appointed and an evidentiary hearing scheduled. Doc. 18. The hearing was held on August 9, 2010. Doc. 32 (minutes). The

_____

[1] As previously noted, doc. 18, p. 1, Respondent maintains disagreement with the court as to the timeliness of the § 2254 petition. Doc. 14, p. 18.

redacted transcript was filed as doc. 35. Expansion of the record was granted. Doc.

37. The expanded record includes Exs. CC-KK. Doc. 36. Petitioner and Respondent

filed written closing arguments. Docs. 39 and 42.

References to exhibits are to those provided by Respondent unless otherwise

noted. Specifically, exhibits A-X were submitted in paper form in support of the motion

to dismiss, and exhibits Y-BB were submitted in paper form in support of the answer.

*See* docs. 5-2 and 14-1 in ECF (electronic case filing) (the electronically filed index to

exhibits in support of motion to dismiss and the answer, respectively). Exs. CC-KK

were submitted in paper form and filed electronically. Docs. 36-1 (Exs. CC, DD) and

36-2 (Exs. EE-KK).

**Procedural History**

Petitioner challenges his conviction out of the Second Judicial Circuit, Leon

County, for sexual battery on a victim who was physically helpless to resist in violation

of FLA. STAT. § 794.011(4). Ex. C, pp. 2 (amended information), 70 (verdict), and 112-

120 (judgment). The date of the offense was August 14, 2002. Ex. C, p. 2.

The elements of this offense are that the victim was twelve years or older, that

Petitioner committed a sexual act (penetration or union of penis with vagina) without the

victim's consent, and the victim was physically helpless to resist. Ex. Z, pp. 374-375

(jury instructions). "Consent means intelligent, knowing and voluntary consent and does

not include coerced submission." *Id.*, p. 375. The jury could consider any mental

incapacity or defect of the victim in determining consent. *Id.* "Physically helpless

means that a person is unconscious, asleep, or for any other reason physically unable

to communicate an unwillingness to act." *Id.* The jury was also instructed on the lesser

included offenses of sexual battery (without consent but not requiring that the victim be physically helpless) and battery. *Id.*, pp. 352-353 (closing argument) and 375-376 (instructions).

Petitioner was sentenced to a total of fourteen years, to serve nine years of imprisonment followed by five years supervision, and was declared to be a sexual predator. Ex. C, p. 114, 117. The judgment was affirmed on direct appeal. Exs. G and H. Petitioner sought and was denied postconviction relief pursuant to Fla.R.Crim.P. 3.850. Ex. R (3.850 record on appeal). The appellate court affirmed. Exs. U and V.

Both § 2254 claims presented here pertain to evidence of whether the victim, referenced here as C.W., in fact took the sleeping pill known as Ambien (brand name) or Zolpidem (the drug or generic name), as she testified at trial.[2] The evidence now at issue, discovered by defense counsel shortly after trial, is that Ambien is a drug which can be identified through standard drug testing by the Florida Department of Law Enforcement (FDLE), a test for Ambien was in fact performed by the FDLE on the urine sample taken from C.W., and the test was negative for Ambien. Doc. 1, p. 3; Ex. C, p. 105; Ex. D, p. 9. Petitioner asserts a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)[3] and its progeny, including Giglio v. United States,

---

[2] It appears the drug was not available in the less expensive generic version at the time of trial (*see* Ex. Z, p. 159), but is referenced by both names in the record.

[3] Brady held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196-97.

405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972),[4] for the failure of the prosecution to disclose favorable evidence that a test was performed for the presence of Ambien and the result was negative for the presence of Ambien; and for allowing and causing the introduction of false or misleading evidence contrary to this evidence. Petitioner challenges trial counsel's failure to discover this favorable evidence prior to trial as ground two.

**Trial evidence**[5]

C.W. testified that she and Petitioner met online and chatted, by instant message, for some months before August of 2002. Ex. Z, pp. 24-27. She testified to having fibromyalgia and insomnia for years, and explained various medications which had been prescribed for her. *Id.*, pp. 29-32. She said that for insomnia she would take Klonopin and Tylenol P.M., and if that did not work to induce asleep in about 20 minutes, she would either get up or would take an Ambien. *Id.*, p. 33 (these drugs are discussed ahead). She said that Ambien would work in five or ten minutes. *Id.* She would usually sleep for about ten hours after taking an Ambien. *Id.*, p. 34.

C.W. said that she met Petitioner face-to-face for the first time one night at Pockets Pool Hall, around 11:00 or 11:30 P.M. *Id.*, p. 36. They stayed for two or three hours, and did not kiss or make any plans to see each other again. *Id.*, pp. 37-38. They resumed chatting on the internet after that. *Id.* Another time, on a Friday, he called and

---

[4] Giglio held that a defendant "must establish that the prosecutor 'knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony,' and that the falsehood was material." Brown v. Head, 272 F.3d 1308, 1317 (11th Cir. 2001) (citations omitted), *cert. denied*, 537 U.S. 978 (2002).

[5] Not all of the testimony is discussed here.

asked what she was doing; he met up with her and her friend Tanja at Café Cabernet that evening but did not stay long. *Id.*, pp. 39-40. Another time he went out with C.W. and Tanja for sushi. *Id.*, pp. 40-41. They all went together in the same car, and returned to C.W.'s apartment afterwards; Tanja did not stay long. *Id.*, p. 41. C.W. and Petitioner watched a movie, but C.W. became tired and wanted to nap. *Id.* She tried to nap in her room while Petitioner was watching the movie in the living room but was not able to fall asleep. *Id.*, pp. 42-43. She did not take medication to take the nap, but previously, on the telephone, had told him before that she had to take Ambien to fall asleep, and that she had fibromyalgia and insomnia. *Id.*, p. 42. She told Petitioner that after she took Ambien, she would not be able to stay on the telephone long. *Id.*

C.W. said that when she could not take a nap, she made a sighing sound and Petitioner, who had been watching the movie, came in and asked what was wrong. *Id.*, p. 43. When she told him she could not sleep, he sat on the end of the bed and they talked; she said he did not lie down next to her. *Id.* She was ready to get up and he said he wanted to nap, so he took a nap for at least an hour and she got up and went online on the computer. *Id.*, pp. 43-44. C.W. said her mother dropped her dog off while Petitioner was napping. *Id.*, p. 87 (cross). It was late when Petitioner woke up, so he went with her to walk the dog and she walked him to his car. *Id.*, p. 44. C.W. said there was no physical contact or kissing, and that she has a condition which makes kissing painful. *Id.*

Another time C.W., Tanja, and Petitioner went out together to meet some other friends to play pool at Halligan's Pool Hall. *Id.*, p. 45. They went afterwards to get a meal, then wanted to go out somewhere else. *Id.*, p. 46. C.W. and Petitioner went back

to her apartment; Tanja and another person were supposed to meet them there but they did not. *Id.*, pp. 46-47. C.W. and Petitioner watched a movie while they were waiting for the others. *Id.*, p. 47. She said they sat on the futon together, but did not kiss or cuddle or hold hands. *Id.*, p. 48. He left, and she took an Ambien to go to sleep. *Id.* She said a few minutes later he called on her cell phone and said his car would not start. *Id.* She told him she was not supposed to walk around after taking an Ambien, but she would leave her door unlocked so he could take her car keys to jump-start his car. *Id.* She did so and went to sleep, and when she woke up her car keys were there and the door was locked. *Id.*, p. 49.

That incident, when she left her keys out, was the night before Petitioner was to go to Biloxi, leaving on Friday and returning the following Friday. *Id.*, p. 50. C.W. thought she spoke to Petitioner at least twice on the phone while he was in Biloxi. *Id.* He called her that Tuesday to say he was coming back early, and was on his way to Tallahassee. *Id.*, pp. 50-51. She said they had not had any prior physical contact or conversation about being boyfriend and girlfriend. *Id.*, p. 51. She said she previously told Petitioner she was interested in someone named Zach, who lived in South Florida and was coming to Tallahassee on Wednesday. *Id.*, pp. 51-52.

C.W. said she was communicating by instant message with Petitioner that Tuesday, and "[h]e was asking me questions about Zach, and I had asked if he would feel comfortable hanging out if we went as a group and Zach was there, if he would be okay with that." *Id.*, p. 52. She said "the reason why I asked [was] because he previously told me that he liked me a lot, and so I was concerned for his feelings." *Id.* She said she told Petitioner she just wanted to be friends. *Id.*, p. 53.

Case No. 4:08cv175-SPM/WCS

C.W. told Petitioner that her group was going out to Fat Tuesdays that night but he did not meet them there. *Id.*, pp. 53-54. She went back to her apartment with Tanja and Tanja's friend Torin, and her cell phone rang as they all walked in the door. *Id.*, p. 54. C.W. testified it was Petitioner calling to ask if he could come over to see her, and she said she "was exhausted and sweaty and just wanted to take a shower, those kind of things." *Id.*, p. 55. She said Tanja and Torin left during the conversation, and she put the phone on hold as they were leaving. *Id.*, p. 55. C.W. said she agreed to call Petitioner back after she took a shower, and she did. *Id.* He told C.W. he was on his way and it would take him only 10 minutes to get there. *Id.*

C.W. testified:

> So I was exhausted, wanting to go to sleep. I didn't want to debate with him about it. So I said, okay. The door will be unlocked, but I am going to take my medicine and go to sleep. So if I am asleep, just go ahead and leave and lock the door.

*Id.* She explained she was comfortable doing this after she had left her door unlocked the other time, the Thursday night before, and thought she could trust Petitioner. *Id.*, p. 56.

C.W. said it was 2:15 or 2:20 in the morning, she left the door unlocked, and "took three Tylenol [P.M.s] and a Klonopin." *Id.* She got under the covers in her bed, wearing a sports bra and underwear. *Id.* Petitioner got there at 2:30 or 2:35 A.M. He asked for a hug and she said she hesitated but gave him a hug, with the covers pulled up around her, then they talked. *Id.*, p. 57. She was complaining about being so tired from going out, and he asked if she wanted a massage. *Id.* She said she was reluctant because he had asked before, but he previously told her he was certified in massage

therapy, so she was comfortable that he knew what he was doing and would not hurt her, with her medical condition. *Id.*

C.W. said she turned over on her stomach and pulled the sheet down so he could rub her shoulders. *Id.*, p. 58. She thought he did that no longer than ten minutes and then she decided she needed to take an Ambien, which she kept next to the bed. *Id.*, p. 58. She said she did not have to physically get up or come out from under the covers to take the Ambien. *Id.*, p. 59. She said "[r]ight before I took it, I had it out in my hand, and I asked him, can I trust you." *Id.* By that, she said, she meant that when she fell asleep he would leave, not let her dog out, and lock the door. *Id.* C.W. said Petitioner then asked if that was the stuff that made her forget things and she said yes. *Id.* She told him it usually took five or ten minutes to kick in, and it would be quick since she had not eaten in awhile. *Id.* She took the pill. *Id.* She said that after taking the Ambien, she had laid down on her back. *Id.*, p. 61.

C.W. said she was not awake long after that, and:

> The next thing I remember is I'm laying on my stomach on the opposite side of the bed. And I woke up hearing him from behind me saying, does this feel good? And feeling penetration in my vagina. And I said, what are you doing? And then I fell unconscious again.

*Id.*, p. 60. She said she could not sleep on her stomach "because I can't sleep on the sides of my face because of my jaw. It causes extreme pain." *Id.*, p. 60. She said she had never woken up on that side of the bed before. *Id.*, p. 61.

C.W. said that after waking up feeling the penetration, and then falling unconscious again, she woke up needing to urinate. *Id.*, p. 61. She said while urinating in the bathroom she noticed her panties were wet, that they smelled like semen, and "it

also burned when I urinated which is usually what occurs after I've had sex." *Id.*, p. 61.

She said she was still very dazed, and she was standing in the hall looking at Petitioner

still in her bedroom, and she asked why it would feel like she just had sex. *Id.*, p. 62.

He said he did not know, and said he did not know when she asked about the "cum" on

her underwear. *Id.* C. W. said:

> So I asked him if I had a rape kit done, would it come up negative? And
> he said, probably not. And I asked him, why? And he said because he
> had cum in his boxers.

*Id.* She testified, "I guess my fight or flight mode kind of kicked in as fast as it could,

and I said, get the fuck out." *Id.* Then she remembered crawling back into bed "feeling

like I was going to pass out," then "vaguely remember[ed] hearing the sound of his belt

buckle." *Id.*, p. 62-63. That was all she said she remembered before waking up around

1:00 P.M. the following afternoon. *Id.*, p. 63.

C.W. said when she woke up she started with her usual routine of going to her

computer chair. *Id.*, p. 63. When she noticed she was no longer wearing the sports

bra, she testified, everything came back to her and she got upset and started crying. *Id.*

She called Tanja and started crying. *Id.*, pp. 63-64. C.W. said Tanja kept asking what

was wrong, and she finally calmed down enough to said "I think I was raped," and Tanja

came right over to see her. *Id.*, p. 64. C.W. said she also tried to reach her mother,

and then called her father. *Id.*, pp. 64-65. She told her mother "I think I was raped,"

and her mother came over to see her. *Id.*, p. 65. She said at this point she had not

showered or urinated. *Id.*, pp. 65-66.

C.W.'s mother drove her and Tanja to the hospital, and C.W. was put into a

separate waiting room. *Id.*, p. 66. She was examined, had to urinate in a cup, and was

given shots and pills.  *Id.*, p. 67.  The nurse called the police after asking if C.W. wanted

her to call them.  *Id.*  C.W. gave a statement to the officer, and also wrote out a

statement.  *Id.*, p. 68.  She went by her apartment to get a few things before going to

her parents' house.  *Id.*  An officer followed them home, and told her not to touch

anything in a certain area of her apartment.  *Id.*

C.W. said she did not get any instant messages or phone calls from Petitioner

that day, which was unusual.  *Id.*, p. 69.  She testified that she went back to her

apartment but moved back in with her parents the end of that month (August), and that

now she hardly ever leaves the house, does not go to school, or work, or talk to friends.

*Id.*, pp. 72-74.  She identified Petitioner in the courtroom.  *Id.*, p. 75.

On cross examination, C.W. discussed her medical conditions and the

medications she was taking at the time of trial.  *Id.*, pp. 75-79.  She agreed to saying at

her deposition that she would take different drugs until something worked, so she could

not specifically say on which night she took something and not something else.  *Id.*, p.

80.

C.W. agreed that, during the relevant period, meeting people through instant

messaging was common for her, and she met 10-15 people that way whom she

eventually met in person.  *Id.*, p. 83.  She said at the time she left her door unlocked and

her car keys out for him, she and Petitioner were friends.  *Id.*, p. 90.  She said there was

one time she was "bugging" Petitioner to remind her to go to financial aid, "and he was

bugging me that he could come along."  *Id.*, p. 91.  She admitted she told Petitioner she

wanted him to meet a close friend of hers who was coming to town.  *Id.*, p. 91-92.  C.W.

admitted that she told Petitioner that she told her boss about him, that her boss was

happy for her and said Navy men are good men. *Id.*, p. 92. She agreed that she had talked about going to Jacksonville with Petitioner and Tanja to go shopping, and that she answered differently at deposition because she did not remember at that time. *Id.*, p. 93. She agreed that before he left for Biloxi, she told Petitioner she would miss him. *Id.*, pp. 93, 95

Asked about the instant messaging, C.W. agreed she told Petitioner to call her cell phone to make her "feel loved." *Id.*, p. 94. Asked if she remembered sending an instant message for Petitioner to think of her while he took a shower, she said she remembered reading (in the print-out of instant messages) that she said it. *Id.* C.W. said she told Petitioner to call her when he got to Biloxi because she wanted to make sure he was there safely, and that she gave him her work number in case there was an emergency and he needed to call her. *Id.*, p. 95. They could not communicate by instant message while he was in Biloxi (where he would not have a computer), and she recalled they talked twice on the telephone while he was gone. *Id.* She agreed that one of the conversations could have been for about 30 minutes, though she said she did not like talking on the phone. *Id.*, p. 96.

C.W. agreed that Petitioner returned early from Biloxi, and they began instant messaging again on August 13th. *Id.* He told her he liked her a lot, and she said she felt uneasy but did not want to hurt his feelings. *Id.* She said she did not "directly" tell him she did not like him that way; she had trouble being direct because of not wanting to hurt his feelings. *Id.*, p. 97. She wrote asking why he liked her a lot, and he said she was sweet and he liked being with her. *Id.*, p. 97. He wrote that he was happy talking or cuddling with her; C.W. testified that she ignored this rather than saying we never

cuddled.  *Id.*  He asked if he should go on (apparently saying why he liked her), that she said no, and he said okay.  *Id.*  C.W agreed she continued by saying "unless you want to," but claimed that she said this "[s]arcastically."  *Id.*, pp. 97-98.

C.W. said she thought Petitioner might be jealous of Zach because she told Petitioner she liked Zach.  *Id.*, p. 98.  She said Petitioner was her friend but thought he was starting to like her more than that, and thought telling him she liked Zach would be a hint to let him know.  *Id.*  99.  She agreed that Petitioner asked her if she would date Zach and she said she was not sure.  *Id.*  She had chatted with Petitioner about how she would act with Zach if Petitioner were there, and how she would act with Petitioner if Zach were there, and told Petitioner she thought guys were confusing.  *Id.*, pp. 99-100.  She explained in court that they were confusing in general and confusing for her because of all her medical problems.  *Id.*, p. 100.  C.W. told Petitioner she did not even know what she wanted sometimes.  *Id.*  She had told Petitioner they were "[f]riends with potential and a wink on the instant messages," meaning a possibility of becoming better friends and to let him know she was being silly.  *Id.*  She later explained on redirect that this meant with the potential to become better friends, whereas friends who might have sex would be referred to as "friends with benefits."  *Id.*, p. 123.

Asked why she did not tell Petitioner not to come over that night when she returned home from Fat Tuesdays, she said she was a "pushover," that she was trying to be nice, he really wanted to come over, and she was too tired to explain or argue with him.  *Id.*, p. 105.  She took some medication, left the door unlocked and got into bed wearing a sports bra and panties.  *Id.*, pp. 109-110.  She said she did not have to get out of bed to take the Ambien, though she had said earlier in a statement that she "took

it and got back into bed." *Id.*, p. 110. Asked if lying on her stomach for the massage was the same position she said she could not sleep in because it hurt too much, she said "that's why I would place my face in a different position." *Id.*, p. 111. She woke up on her stomach on the other side of the bed, after hearing him ask "does this feel good" and then feeling penetration. *Id.* C.W. said the only thing she said at that time was "what are you doing," and other than that she was unconscious. *Id.*, pp. 111-112.

C.W. said that she was barely conscious when she got up to use the bathroom, but she remembered the term "rape kit" from reading women's magazines. *Id.*, p. 114. The next morning she was confused and upset, and Tanja called a women's clinic to find out what to do as C.W. wanted to know her options. *Id.*, p. 115.

C.W. said she took the Tylenol P.M. and Klonopin before Petitioner came over, and did not take those drugs in front of him. *Id.*, p. 118.

Kimberly Meals was the nurse who examined C.W. and collected physical evidence on August 14, 2002. *Id.*, p. 125-129. Meals testified that C.W. had a small vaginal tear, which is found in maybe 30% of cases, that it is possible but not probable to have a tear from consensual sex. *Id.*, pp. 131-138. The position of the tear was not consistent with rear entry. *Id.*, p. 137. She said C.W. arrived at the hospital at 3:48 in the afternoon. *Id.*, p. 139.

Physician Albert Menduni was called as a witness for the State and was qualified as an expert in internal medicine. *Id.*, p. 148-150. The State qualified Dr. Menduni as an expert in internal medicine. *Id.*, p. 150. Dr. Menduni testified that he had treated C.W. for multiple problems, including fibromyalgia, "a disorder of the collagen vascular system," "a musculoskeletal disorder in which patients have a resetting of their

appreciation of pain." *Id.*, p. 151. He testified to her various medications and treatment. *Id.*, pp. 151-154.

Dr. Menduni said that Ambien is a "good hypnotic," with low addictive risk, and "gives people four hours of excellent sleep guaranteed," putting someone to sleep in "5 to 10 minutes." *Id.*, p. 155. He said it works so quickly he tells his patients not to take it down in the kitchen, but in bed, "[b]ecause if they take it in the kitchen, they are going to find themselves asleep walking up the stairs. They are going to wake up on the stairs, okay?" *Id.*, pp. 155-156. He said:

> It is a very effective hypnotic. And it will put you to sleep, and you will stay
> asleep for those four hours. Some patients on Ambien, it will take a fire to
> arouse you during those first four hours. You can be aroused during those
> first four hours, but it is extremely difficult to wake up during those first four
> hours. And you will have – in the next four hours, you will have good
> sleep as well. But much easier to arouse you during the next four hours.

*Id.*, p. 156.

Dr. Menduni said "Klonopin is a benzodiazepine," used for anxiety and as a sedative, and "has a relatively short half life" which makes it less addictive. *Id.* "With short half life, you don't have to worry about a hangover with that type of drug." *Id.* It was helpful for C.W. for her Fibromyalgia, anxiety, and to "calm her down" from the Adderall (a stimulant) she took for narcolepsy. *Id.*, p. 157.

Dr. Menduni explained that Tylenol P.M. is acetaminophen combined with Benadryl, sold over the counter, and he did not like to use it as a sleep aid. *Id.*, p. 157. He agreed that three Tylenol P.M. tablets and a Klonopin "would mellow [C.W.] out significantly," and if she took an Ambien 20 minutes later, "[t]hat would definitely put her

to sleep." *Id.*, pp. 157-158. He said she would be asleep in five or ten minutes, and it would be very hard for her to wake up for four hours. *Id.*, p. 158.

The urine and blood tests done by the Florida Department of Law Enforcement (FDLE) were shown to Dr. Menduni.[6] *Id.* The prosecutor identified them as "a drug screen" on urine, and the other one was the drug screen on the blood sample, and asked what drugs had been identified. *Id.* Menduni said "the urine screen" showed amphetamines (directly related to Adderall), seven amino Clonozepam (a break down of Klonopin), and diphenhydramine (Benadryl), and the blood report showed the Adderall and Benadryl. *Id.*, p. 158.

The State asked Dr. Menduni if the FDLE "screened" for Ambien, Dr. Menduni said:

> I know of no drug screen for Ambien. *They did not screen for Ambien.*
> *The technology they use* [the FDLE] *did not screen for Ambien.*

*Id.*, p. 159 (emphasis added).[7] Asked if he was aware of a *test* that would *screen* for Ambien, he said he had not researched it and did not know. *Id.*

Dr. Menduni volunteered that Ambien is expensive, and it sounded like C.W. "was trying to use a less expensive way of falling asleep, Tylenol PM and generic Clonazepam. . . . And if that didn't work, then she would go over and use the expensive

---

[6] The lab reports signed by Lisa Zeller were submitted at trial as State's Exhibits 11 (urine) and 12 (blood). Ex. AA (trial exhibits).

[7] This is the pivotal evidentiary point for this petition for writ of habeas corpus. The *State* presented the evidence that there was not drug test or screen for Ambien, evidence which proved to be false.

Page 16 of 64

Ambien. That's a guess." *Id.* He ventured the opinion that he did not think that C.W. "Was trying to have a good time." *Id.*

On cross examination Dr. Menduni was asked if there was a way to "prove" whether someone had taken Ambien, or if "they could say they took it, but there is no way to prove it?" *Id.*, p. 161. He answered, "I don't know of an assay.[8] That doesn't mean there isn't an assay. I really wasn't asked to research that." *Id.*, p. 161.

Dr. Menduni also explained about C.W. taking stimulants with sedatives. *Id.*, pp. 162-164. He said that sedatives "take the edge off the stimulant." *Id.*, p. 164.

Tanja Hinton testified at trial for the State. She was familiar with C.W.'s sleeping problems and that she took Ambien, but C.W. had never taken Ambien in front of Hinton. *Id.*, pp. 219-220. Hinton said that the first time she met Petitioner was at Café Cabernet, when he met up with her and C.W. for a drink. *Id.*, pp. 221-222. She saw him again about a week later, when the three went out together for sushi. *Id.*, pp. 222-223. Hinton saw him again when they played pool. *Id.*, p. 225. She said C.W. had told her in this period that she thought Petitioner "was a really nice guy but that she wasn't interested in him because she was interested in" Zach. *Id.*, p. 226.

On August 13, 2002, Hinton went to Fat Tuesdays with Torin (Hinton's boyfriend at the time), C.W., and a friend named Daniel. *Id.* They took C.W. home; the phone rang and C.W. said it was "Rik." *Id.*, p. 227. Hinton and Torin "hung around," but since C.W. was on the phone, they decided to leave; C.W. put the phone on hold and said

--------------------------------

[8] An assay in this context is an analysis or test to determine the presence, absence, or quantity of the substance. See www.merriam-webster.com/dictionary/assay.

Case No. 4:08cv175-SPM/WCS

"o.k." as they left. *Id.* Around 1:00 the next afternoon, C.W. called Hinton. *Id.*, p. 228.

She was crying and said she thought she had been raped. *Id.* Hinton immediately went

to C.W.'s apartment. *Id.*, pp. 228-229. Hinton contacted a Women's Center for

information, and talked to C.W.'s mother, who then came to the apartment. *Id.*, p. 230.

Hinton said she also called Petitioner, and "I left him a voice mail stating that I was

trying to figure out what was happening and that I would like him to give me a call back,"

but he did not return her call. *Id.*, p. 231. Hinton went with C.W. and her mother to the

hospital, and stayed until they all went back to the apartment for C.W. to pick up her

things. *Id.*

On cross examination, Hinton said she did not know Petitioner and C.W. had

ever been out together or alone together before the time they all met at Café Cabernet.

*Id.*, p. 234. She knew the two went together to TCC (Tallahassee Community College),

maybe to get books, but that all the other times C.W. saw Petitioner it was when Hinton

was also there. *Id.* She said although C.W. was close to her mother, that C.W. "was

scared to call her mother," but Hinton felt strongly she should call her mother and

should go to the emergency room. *Id.*, p. 237. As far as Hinton knew, Petitioner and

C.W. had only been communicating for only a few weeks before the first time Hinton

met Petitioner, *Id.*, pp. 238-239.

C.W.'s mother testified that C.W. would take Ambien when the other drugs were

not working, and once she took Ambien it was almost impossible to get her up the next

morning. *Id.*, p. 245. Even if she could awake C.W. the next morning, she might go

"right back out," unconscious again. *Id.*, pp. 246-247.

Ted Houston, a pharmacist and an expert in pharmacology, testified for the

defense. *Id.*, p. 336. He was the only pharmacist in the therapeutics community,

advising physicians, for Capital Health Plan. *Id.* Houston explained the effect of Tylenol

PM, used for sleep and pain relief. *Id.*, p. 337. He said Klonopin is a "multi-task drug,"

used for seizures, but is also used as an anti-anxiety medication and can cause

sedation. *Id.* Ambien is a hypnotic, used to induce sleep. *Id.*

Houston said there would be a synergistic effect in the central nervous system

from the Klonopin and Benadryl, depressing the central nervous system, including

breathing, the urinary tract, and the gastrointestinal tract. *Id.*, p. 338. Houston said that

taking three Tylenol P.M., Klonopin, and Ambien would cause a "very deep, hard sleep."

*Id.* Taking the three drugs could slow the urinary tract, but could cause "urgency,"

depending on the person and how long they had been taking that combination of drugs.

*Id.*, p. 339. He thought it was possible but would be very difficult for someone who took

those medications to get up and walk across the room, sit on a toilet, or speak four or

five sentences in conversation. *Id.* , p. 340. With the first two drugs, but without the

Ambien, however, Houston thought a person could be awakened. *Id.*, p. 341.

Houston reviewed the FDLE blood and urine laboratory test results, State's

Exhibits 11 and 12. *Id.*, pp. 341-342. He explained that in testing, if there was

something unusual or different from what was normally in a person's urine or blood, it

would "fall out" as an unknown substance. *Id.*, p. 342.

Houston did not see anything in the list of substances in the FDLE urine test that

looked like Ambien. *Id.*, p. 343. Counsel for Petitioner asked: "And one of the doctors

who testified here Dr. Menduni testified that he wasn't aware of a test to show Ambien in

the urine. Would you agree with that?" *Id.*, pp. 343-344. Houston said yes. *Id.*, p. 344. Asked if Ambien would "fall out" in the testing and be listed, Houston said as an "[u]nidentifiable substance, maybe, yes." *Id.* He did not see any unidentified substance listed on this report, and did not see any other substance that could be Ambien mentioned on the blood test report. *Id.*

On cross examination, the prosecutor confirmed that Houston had never worked at FDLE. *Id.*, p. 345. The prosecutor read aloud from the bottom of the urine test result, "[t]his urine sample was analyzed for the following drug or drug classes," and asked whether "[a]ny of those stated in the list would be Ambien?" *Id.*, p. 345. Houston said Ambien was not listed. *Id.* He said the same went for the blood test, that a lot of things were listed, but not Ambien. *Id.*, pp. 345-346. He was asked, "[s]o as far as you know, based on that report, they didn't test for Ambien at FDLE?" and he agreed. *Id.*, p. 346. Houston also agreed with the prosecutor that he was not aware of a test to identify Ambien.[9] *Id.*

On redirect, defense counsel said, "just to clarify these FDLE reports, I realize that there was no test for this specific drug, Ambien," then asked whether the point of the FDLE tests was to "throw out" or "fall out" an unidentified substance not normally found in the urine or blood. *Id.*, p. 348. The prosecutor objected that Houston never worked for FDLE. *Id.*, p. 348. Asked again, the court told counsel to first lay the

---

[9] The *State*'s cross examination of Houston, therefore, confirmed the prosecutor's erroneous belief that the FDLE did not have a test for Ambien and that the laboratory tests performed by the FDLE did not in fact test for the presence of Ambien. This cross examination likewise again emphasized for the jury the prosecution's position that there was no test for Ambien and that the FDLE did not test for Ambien.

predicate.  *Id.*  Counsel then asked Houston if he knew "anything about these," and Houston said "I know nothing about the FDLE test," but did "know about drug testing in general, if there is something that is foreign in the test, it falls out, even though they may not be testing for it."  *Id.*  Counsel said "here anything would have fallen out and would have been listed on there," and an objection was made that it assumed facts in evidence as Houston was unfamiliar with FDLE testing.  *Id.*, pp. 348-349.  The objection was overruled, and Houston said he "would think" it would fall out during testing, as either Ambien or Zolpidem.  *Id.*, p. 349.

The defense rested.  *Id.*  While the jury was out, the court asked Petitioner on the record if he was satisfied with counsel and the advice not to testify, and Petitioner said he was.  *Id.*, pp. 349-350.  The renewed motion for judgment of acquittal was denied, and the defense again rested.  *Id.*, p. 351.  The State did not put on rebuttal evidence.

**Closing arguments**

In closing, the prosecution argued that C.W. took medication "because what she had taken didn't work," and that all the testimony showed "she was knocked out, unconscious, within 5 to 10 minutes."  *Id.*, p. 355.  It was argued that the sexual penetration was painful, and C.W. did not know until she woke up what happened, which was not consent and so sexual battery had been proven.  *Id.*, pp. 355-356.  The prosecutor argued, however, that "the crime that he is charged with is sexual battery with a physically helpless victim, and that is a sexual battery with the addition that the State has proved to you that the victim was, in fact, physically helpless to resist."  *Id.*, p. 356.  It was argued that "physically helpless means that a person is unconscious, asleep, or for any other reason physically unable to communicate an unwillingness to

act." *Id.* It was argued that this had affected C.W.'s life, that the testimony was not

refuted, and that Petitioner should be found guilty as charged. *Id.*, p. 357.

In closing, Petitioner's attorney pointed out how C.W. remembered things on

cross examination that she did not remember on direct:

> And you've got to ask yourself why suddenly between direct examination
> and cross examination does she remember one thing, and she doesn't
> remember another. And that's important because it goes to her whole
> credibility. *And it may very well come down to whether or not that Ambien
> was taken, whether or not there is evidence beyond a reasonable doubt
> that that Ambien was taken.*
>
> The only evidence that it was taken was from [C.W.]. *There is no
> independent evidence of that.* And while I think every single expert that
> did testify testified that there is no specific test for Ambien, it would,
> however, show up as an unidentified substance. And it is not there.
>
> *And, again, if she is not credible about taking Ambien, then how can she
> be credible with anything else that she said?*

*Id.*, pp. 359-360 (emphasis added).

In rebuttal, the prosecutor argued that C.W.'s "testimony has been corroborated

in every single way *that it can. In every single way.*" *Id.*, p. 367 (emphasis added).

> We've showed you the drugs. We've showed you the drugs in her system
> is [sic] exactly what she said except the Ambien. And Miss Flury said they
> didn't show you that she took the Ambien.
>
> There is nothing that says she didn't. Mr. Houston is not familiar with the
> test-running at FDLE. *Dr. Menduni told you that the screen they ran would
> not find Ambien. There is nothing that says that if Ambien was in her
> system, the screen they ran at FDLE would show that.*
>
> *And Dr. Menduni and even Mr. Houston agreed there is no test to
> determine whether Ambien is in your system. So could the State have
> presented that evidence to you? And the answer is no. There is no test.*
> But everything else she said she takes is right there. That corroborated
> her statement.

*Id.*, pp. 367-368 (emphasis added).

The jury found Petitioner guilty.  *Id.*, p. 384.

**Post-trial motion**

Prior to sentencing, Petitioner filed an amended motion for judgment of acquittal

and or new trial.  Ex. C, pp. 103-108 (motion dated December 12, 2003).  As relevant

here, he argued that the state failed to reveal, as required by Brady, that Ambien can be

identified through standard FDLE drug screens, that C.W.'s urine was in fact tested for

Ambien, and that Ambien was not detected.  *Id.*, p. 105.

> On December 10, 2003,[10] undersigned counsel spoke with Lisa Zeller,
> Toxicologist, Florida Department of Law Enforcement (FDLE).  Ms. Zeller
> was listed in the State's discovery response but was not available for
> trial.[11]  Her laboratory report was admitted into evidence by stipulation.
>
> Ms. Zeller's laboratory report reported the results of a urinalysis of C.W.
> performed.  The laboratory report did not show that the urine was tested
> for the presence of Ambien.  In this conversation, Ms. Zeller told
> undersigned counsel that Ambien can be screened and that urine in this
> case was screened with a test that would reveal Ambien's presence.  The
> results of the test were of great importance to the case because the
> complaining witness testified that she was unconscious due to taking
> Ambien and other drugs minutes before the sexual battery.

Ex. C, p. 105.  While Giglio was not cited, Petitioner's attorney alleged facts raising a

Giglio claim, that instead of revealing these exculpatory facts, "the state elicited

testimony to the contrary at trial" in its examination of Dr. Menduni (that there was *not* a

test for Ambien), and that when Houston was asked about it the prosecution objected.

*Id.*, p. 106.  Petitioner cited Craig v. State, 685 So. 2d 1224 (Fla. 1996) as holding that

"a prosecutor has the obligation to correct testimony presented by a witness if the

_____

[10] Trial was held October 28 and 29, 2003.

[11] It is still unclear why Zeller was unavailable for trial and her reports therefore
stipulated into evidence.

prosecutor knows the testimony is false, and the testimony is material." *Id*. Craig was a Florida Supreme Court case applying Giglio. 685 So. 2d at 1226.

It was asserted in the motion that Zeller said the test detects the properties of Ambien at the same levels as for amphetamine, which was detected in C.W.'s urine. *Id*., p. 106. "The clear inference of this information is that if Ambien had been present it would have been identified in the specimen," it was argued, and that there was a "reasonable probability that the result of the trial would have been different if the unrevealed evidence would have been disclosed." *Id*. But "[i]nstead of revealing the exculpatory fact, the state elicited evidence to the contrary at trial and affirmatively tried to keep it out of evidence by objecting to Mr. Houston's testimony." Ex. C, p. 106 (citation omitted). It was argued that knowledge of other State agents of the State's evidence is imputed to the prosecutor. *Id*., pp. 106-107 (citations omitted).

A motion hearing was held on December 15, 2003. Ex. BB (transcript). Petitioner's attorney clarified that the claim was not under Brady, which required the exercise of due diligence by the defense, but under Bagley:

> It's the Bagley, B-a-g-l-e-y, standard where the State should have presented that, shared that information with the defense because *the steps that the defense took in this case of accepting the lab report, hiring an expert to look at the lab report, not deposing the scientist because of the fact that – the FDLE scientist because there was no indication that Ambien was tested in this case. The State's witness Dr. Menduni testified there was no known test for Ambien*.

Ex. BB, p. 16 (emphasis added). *See* United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).[12]

_____

[12] In Bagley:

Counsel argued that the evidence was newly discovered on December 10, 2003, and that finding the information was "serendipity" as the defense investigator just happened to speak to another FDLE toxicologist, who said they could test for Ambien in urine, so she contacted Zeller. *Id.*, pp. 16-17.

Lisa Zeller was called as a witness. *Id.*, p. 17. Zeller said that, on October 9, 2002:

> I performed an initial drug screen testing for amphetamine, barbiturates, benzodiazepines, cannabinoids, carisoprodal, methadone, and opiates, and then performed additional screening for other sedative-hypnotic and – different drugs and then also a GHB[13] screening.

---

the Court disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes, and it abandoned the distinction between the second and third *Agurs* circumstances, *i.e.*, the "specific-request" and "general- or no-request" situations. *Bagley* held that regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

Kyles v. Whitley, 514 U.S. 419, 433, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995) (citations omitted). Kyles also noted that:

> In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), however, it became clear that a defendant's failure to request favorable evidence did not leave the Government free of all obligation. There, the Court distinguished three situations in which a *Brady* claim might arise: *first, where previously undisclosed evidence revealed that the prosecution introduced trial testimony that it knew or should have known was perjured*, 427 U.S., at 103-104, 96 S.Ct., at 2397-2398 . . . .

514 U.S. at 433, 115 S.Ct. at 1565 (emphasis added).

[13] Gamma hydroxybutyrate (GHB or G) is taken by mouth. It is similar to ketamine or alcohol in its effects, but its effects last longer and GHB is much more dangerous. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at: http://www.mercksource.com (Medical Dictionary link).

*Id.*, p. 18.  She agreed that "the screen for other drugs is a broad screen," and that Ambien would fall under other drugs and it has sedative-hypnotic properties.  *Id.*, p. 19.  She first said it was correct that she was "not actually targeting for the presence of Ambien," and – when asked if it was something she would not list on the report unless asked to – answered "[r]ight.  Well, it's included under the sedative-hypnotic and other drugs."  *Id.*, pp. 19-20.  The minimum detection level at FDLE for Ambien in urine is 150 nanograms per milliliter.  *Id.*, p. 21.

Zeller then said it was correct that in this case the urine was "screened" for Zolpidem (Ambien).  *Id.*, p. 22.  Zeller testified that when the urine was submitted to her for testing *she was told by Detective Furseth that suspected drugs included "Ambien*, Tylenol P.M., Darvocet, and Klonopin, which is Clonazepam."  *Id.*, p. 23 (emphasis added).  Asked about detection levels, she said "performing the basic extraction," that Ambien could be at the same detection level as amphetamine.  *Id.*, p. 23.  Zeller explained that "a basic extraction is just a test that I do to either to confirm something that I may have seen or was indicated in the initial drug screen or I could also use it [as] a drug screen for other drugs, other basic neutral drugs."  *Id.*, p. 24.

Zeller said on direct examination that she had not talked with the prosecutor, Robin Lotane, until after she had talked with counsel for Petitioner, that is, until December 10, 2003, after the trial.  *Id.*, p. 23.  On cross examination by Ms. Lotane, she again confirmed that she did not talk to Ms. Lotane "about the specific testing" she performed until she talked to Whisnant, just a week before the hearing.  *Id.*

Zeller said Ambien has "a relatively short half life," which "is the time it takes for half of the drug to disappear from the system."  *Id.*, pp. 24-25.  She said it was "unlikely

that I would find it" if someone were tested 10-15 hours after taking "a relatively low

dosage" of Ambien, but on recross agreed that Ambien comes in 5 and 10 milligram

tablets, and therefore the strongest Ambien tablet (the one C.W. took) is 10 milligrams.

*Id.*, p. 25.

Counsel for Petitioner at the hearing on the motion for a new trial argued that

knowledge was imputed to the state, that under <u>Bagley</u> she did not have to use due

diligence to discover the evidence, and that the evidence should have been disclosed to

her because it was exculpatory.  *Id.*, p. 26.  She argued:

> [O]nce the prosecutor has constructive possession, they are supposed to
> – the prosecutor has the duty to correct any incorrect testimony,
> inaccurate, or perjured or false testimony.  And instead in this case, your
> Honor, the prosecution objected to my expert and your Honor sustained
> that objection to testifying that Ambien would appear in a drug screen.
> And she placed Dr. Menduni on the stand to testify that there was no
> known test for Ambien.  And, your Honor, I think that this information at
> this point in the post trial would very strongly question, or doubt, the
> verdict in this case.  And the standard in this case is whether the favorable
> evidence could reasonabl[y] be taken to put the whole case in such a
> different light as to undermine confidence in the verdict. . . .
>
> The State can argue what they want regarding half life, but the defendant
> would be allowed to, at least, cast doubt on the testimony of the
> complaining witness who is the only person that testified that she took
> Ambien.  And it's extremely important in this case.

*Id.*, pp. 26-27 (emphasis added).

The prosecutor argued that Zeller's lab reports were supplied to the defense on

November 5, 2002, and again on April 3, 2003.  *Id.*, p. 28.  She argued she had "stacks

of case law here that says the only way that the State would be responsible for bringing

out this evidence is if it was completely within the sole possession of the State."  *Id.*

The court asked if this was the same report which had been stipulated into evidence,

and was told that it was. *Id.*, p. 29. Without any further discussion, the court said "[t]he

motion is denied." *Id.*

Defense counsel made further argument for the record. *Id.* She clarified that this

claim was not under the Brady standard, requiring due diligence, but that the State had

an affirmative obligation to disclose the favorable evidence. *Id.*

> The lab report, as I had Ms. Zeller testify, doesn't say one word about it
> Ambien [sic]. It doesn't say that it was tested. It doesn't say it was
> screened for. And I don't have to do anything further than to rely upon this
> lab report. The lab report is in the record. The lab report does not use the
> term Zolpidem or whatever . . . . So I did not have knowledge of this and I
> am not required to do anything more than rely on this laboratory report
> that was supplied to me.

*Id.*, pp. 29-30.

In addition to Bagley, counsel in argument at the hearing cited Baker v. State,

336 So. 2d 364 (Fla. 1976), and Boshears v. State, 511 So. 2d 721 (Fla. 1st DCA

1987). *Id.*, p. 30.[14] As the report "doesn't indicate that they tested for it *and the State's*

*own witness testified that they did not test for it*," counsel argued, a new trial was

required, and thanked the court for allowing that to be placed on the record. *Id.*

(emphasis added). The hearing ended as follows:

> THE COURT: Thank you. What can I say? You could have presented
> direct evidence that she didn't consume medication.

---

[14] In Boshears the court reversed and remanded the denial of post conviction
relief, without an evidentiary hearing, for an alleged violation of Brady and Bagley,
where the investigating officer's report would have been somewhat exculpatory as to
sexual battery, and also would have provided a basis for impeachment of the victim.
511 So. 2d at 724-725. Baker – not a Brady case – discussed the standard for
determining whether to grant a new trial based on newly discovered evidence, and the
standard of review on appeal of such determinations. 336 So. 2d at 370.

MS. WHISNANT: We attempted to do that through Houston, but the state objected and your Honor --

THE COURT: Well, in any event, the motion is denied. What does the State propose with respect to the restitution . . . ?

*Id.*, pp. 30-31.

**Direct appeal**

On direct appeal, this claim was raised as a <u>Brady</u> violation. Ex. D, pp. 10-14. The brief also cited, *inter alia*, <u>Bagley</u>, <u>Boshears</u>, and <u>Giglio</u>. *Id.* It was argued that the State did not reveal the exculpatory evidence regarding the test, instead eliciting evidence to the contrary and affirmatively trying to exclude the evidence by objecting to Houston's testimony. *Id.*, p. 13. It was argued that whether or not the information was discussed with the prosecutor, the prosecutor is charged with constructive knowledge of the State's evidence. *Id.*, pp. 13-14.

The State responded that this was not new evidence that could not have been discovered with due diligence and that the report was provided to the defense. It was argued that the evidence was not exculpatory because it was already argued to the jury that the test did not support C.W.'s testimony that she took Ambien, and because Zeller's testimony was that 15 hours after a 10 milligram dose she would not expect to find Ambien. Ex. E, pp. 13-17. The State argued there was no <u>Brady</u> violation where the evidence was equally accessible to the prosecution and defense, and that Petitioner was aware of the report and "could have and should have made further inquiry into the analysis performed upon receipt of the report." *Id.*, p. 17. The information could have been established with due diligence, it was argued, and – even if the prosecution was obliged to disclose that Ambien had been tested for and not found -- this evidence was

not material under <u>Brady</u> because it did not put the case in such a different light as to

undermine confidence in the verdict.  *Id.*, pp. 18-20.

> At best, appellant would have been left with taking the position that either
> the drug had dissipated from the victim's system or that she did not take
> the drug at all.  Of course, the latter position is the only one that actually
> benefitted appellant's case, and had the fact that Ambien was tested for
> [been] presented at trial, the State naturally would have presented
> testimony to the effect that because the victim took the pill 15 hours before
> the sample was provided, no result would be the expected result.  This
> testimony would then have helped to discredit appellant's case, rather
> than strengthened it.

*Id.*, p. 20.  The State also argued on appeal that "the evidence complained of here, even

if one could qualify it as exculpatory, *could not become so until appellant took the stand*

*and testified that he was personally aware that the victim had not taken any Ambien.*"

*Id.*, p. 21 (emphasis added).

The judgment was affirmed without opinion on direct appeal.  Exs. G and H.

**Rule 3.850 motion**

Petitioner then filed a post conviction motion pursuant to Fla.R.Crim.P. 3.850.

Ex. R (Rule 3.850 record on appeal), pp. 1-14.  He asserted ineffective assistance of

counsel for counsel's failure to discover the Ambien testing evidence prior to trial.

Petitioner attached an affidavit signed by Houston in support of his Rule 3.850 motion.

Ex. R, p. 12-14 (affidavit signed December 13, 2006).  As an expert, Houston assumed

as fact that C.W. testified that she took a 10 miligram Ambien (Zolpidem) around 3:00

A.M. on the day in question, awoke briefly to urinate at approximately 4:30 A.M., went

back to sleep, slept until 1:00 P.M., and did not urinate until 3:48 P.M. that day.  *Id.*, pp.

12-13.  Houston said he did not know this at the time of trial.  He said he had been

misinformed that FDLE had not specifically tested for Ambien, and he did not know

C.W. did not urinate after approximately 4:30 A.M. until 3:48 P.M., when the urine

sample was taken for testing. *Id.*, p. 13. He said that once the Ambien metabolites

enter the urine they do not chemically change and would remain in the bladder until the

person urinates; and that under the assumed facts there would have been sufficient

quantities in C.W.'s urine at 3:48 P.M. to be detected by the FDLE test. *Id.*, pp. 13-14.

Houston concluded, "to a reasonable medical and pharmacological certainty, that the

alleged victim could not have taken a ten milligram Ambien (Zolpidem) at or around the

time on the day in question, as she alleges and testifies." *Id.*, p. 14.

The Rule 3.850 motion was denied without an evidentiary hearing in a written

order. *Id.*, pp. 15-18 (order signed June 4, 2007).

> The Court finds Defendant's allegations fail to satisfy both prongs of
> <u>Strickland</u>. He presents no evidence that trial counsel's performance
> relative to the discovery of the test fell below an objective standard of
> reasonableness. Both the State and defense experts – a medical doctor
> and pharmacist, respectively – were in agreement that no such test
> existed. At the motion hearing, trial counsel stated it was only by
> happenstance that she discovered such a test was indeed possible. It
> cannot be said that trial counsel was unreasonably deficient for failing to
> uncover *this obscure piece of information* in the face of two expert
> opinions in agreement on the issue. <u>See</u> <u>Smith v. State</u>, 931 So. 2d 790,
> 801 (Fla. 2006).
>
> Even if trial counsel's performance fell below the standard, the Court finds
> Defendant cannot show any resulting prejudice so great that it undermined
> the outcome of the trial. Relying on the absence of a positive test for
> Zolpidem, trial counsel adequately argued that, apart from the victim's
> testimony, the State presented no evidence that she took Ambien. *This
> argument would have remained virtually unchanged in the face of a
> negative test*. Defense counsel elicited testimony from the defense expert
> that, even without a specific test, the presence of Zolpidem would have
> "fallen out" as an unknown substance. Therefore, *the jury was able to
> consider the possibility that the victim did not take Ambien and was
> rendered helpless by the other medications she ingested*. Ultimately, the
> verdict is well-supported and trial counsel's failure to discover the test for
> Ambien did not deprive Defendant of a fair trial. Defendant's claim that he

> would have attacked the victim's credibility by establishing that she did not
> take Ambien is insufficient to satisfy <u>Strickland</u>'s prejudice prong.  <u>See</u>
> <u>Branch v. State</u>, 31 Fla. L. Weekly S573 [952 So. 2d 470] (Fla. 2006).

*Id.*, pp. 17-18 (emphasis added, citations to state record omitted).

The court further found that the evidence was not exculpatory.  *Id.*, p. 18.  "Given the overwhelming evidence of Defendant's guilt; including the victim's testimony, physical injuries, positive tests for other strong sedatives, and rape kit results; the assertion that she did not take Ambien does not exculpate Defendant."  *Id.*

On appeal, Petitioner argued that the state court improperly denied relief without an evidentiary hearing, and that he had made a sufficient showing of deficient performance and prejudice to the outcome.  Ex. S (initial brief in 3.850 appeal).  The State filed a notice that it would not file an answer brief, as a brief was not required from summary denial without a hearing.  Ex. T.  The trial court's ruling was affirmed without opinion.  Exs. U and V.

**Grounds Raised**

Petitioner raises two grounds for § 2254 relief.  Doc. 1.

In ground one he claims a violation of <u>Brady</u>, and error of the trial court in denying his motion for new trial based on a <u>Brady</u> violation.  Doc. 1, pp. 3-4.  He also makes an argument arising under <u>Giglio</u> (prosecutor's obligation to correct false testimony), though that case is not cited.  *Id.*, p. 4.

In ground two, Petitioner asserts ineffective assistance of counsel for counsel's failure to investigate and discover the exculpatory evidence asserted in ground one. Doc. 1, pp. 4-8.  Petitioner argues that his "counsel simply failed to make the inquiry necessary to determine exactly what FDLE tested, failed to inquire of FDLE what the

test results meant, and failed to independently research the test thoroughly enough to fully understand the evidentiary significance of the test results." *Id.*, p. 6.

**This court's evidentiary Hearing**

Counsel was appointed and I held an evidentiary hearing on August 9, 2010. *See*, docs. 18 (order discussing the need for a hearing, incorporated herein by reference), and 35 (redacted transcript). At the outset it is observed there was a good deal of testimony at the evidentiary hearing about questions asked and testimony given at trial. The court relies on the record itself however, recounted in detail above, as to what actually occurred at trial.

The laboratory report at issue, of the testing by Zeller of C.W.'s urine sample, was introduced as Ex. 1 at the hearing. Doc. 35, p. 27. The urine and blood tests reports are also found at Ex. AA in the record. Zeller testified that the blood and urine samples in this case were tested using gas chromatography, mass spectrometry (GC-MS). *Id.*, pp. 76-80, 93, 97. The type of test that was used is not stated in the reports, however, and I cannot find a reference to GC-MS in the trial record.

Robin Lotane, who was the prosecutor, was not available for the hearing. Ms. Lotane had died shortly before the hearing. *Id.*, p. 17.

Deborah Whisnant, who represented Petitioner at trial and on appeal, said at the evidentiary hearing that "[t]he [pretrial] discovery showed there was not a test for Ambien, or that's what came from discovery." *Id.*, p. 7. Whiznant did not further identify such "discovery" or produce written evidence of this assertion. She said that Ambien was not named on the lab report and Dr. Menduni testified for the State that Ambien could not be tested. *Id.*, p. 8. She said if she had known at trial that there was a test for

and that the results were negative for Ambien, her defense would have changed.  *Id.*, pp. 8-9.  She said that whether C.W. took Ambien was the key point in both the state's case and Petitioner's case and became like a feature in the trial."  *Id.*, p. 8.

Whisnant said that the defense theory was that C.W. was not a reliable witness, and the plan was to cast doubt on all of her testimony though other witnesses.  *Id.*, pp. 10-11.

Whisnant said that Jo Ellen Brown, who testified about DNA at trial for the State, said in deposition that there was no known test for Ambien.  *Id.*, p. 15.  This is not accurate, however, as after the deposition, Whisnant provided a list of the people who were deposed and Brown was not deposed.  Doc. 40.

Whiznant said she talked to Zeller in December of 2003 (after the trial), and she said that Zeller "also indicated there was no test."  Doc. 35, p. 15.  She then said she learned that there was a test after trial, contradicting her statement that Zeller had informed her there was no test.  *Id.*  She did not remember whether she talked to Zeller before trial, and could not think of any reason why she would not have deposed her.  *Id.*, p. 21.

The lab report was admitted into evidence as Petitioner's Exhibit 1.  *Id.*, p. 27.  I asked whether Whisnant deposed Zeller.  *Id.*, p. 30.  She did not.  Doc. 40 (sealed).

Theodore Houston testified at the hearing.  He was shown the laboratory report, Ex. 11 (Ex. 1 in my hearing), and said it did not show that Ambien was tested for.  *Id.*, p. 32.  He said that at the time of trial he believed there was a test for Ambien, though his testimony at trial was to the contrary.  *Id.*, pp. 32-33.  Houston said that the half-life of Ambien is one and a half to two and a half hours, that 65% to 75% is excreted through

urine, and that assuming a urine sample was taken 13 to 14 hours after the Ambien had been taken, it should have shown up in the urine sample. *Id.*, p. 33.

Houston explained that there have always been drug tests, and at the time of the trial he did not know if there was a blood test or a urine test, or if they had done both. *Id.*, p. 55. He said that Ambien shows more in the urine than in blood because it is excreted through the kidneys. *Id.*, p. 57. He thought that perhaps, at the trial, he was concurring with and listening to the doctor (Dr. Menduni) rather than going on his own opinion. *Id.*, pp. 57-58. He admitted that his testimony "may have been misguided." *Id.*, p. 58.

Houston said that knowing what he knows about Ambien and looking at the lab report, and assuming that Ambien was taken at the same time as the amphetamine, clonazepam, and diphenhydramine,"[i]t should" show up in the lab report. *Id.*, p. 34. On cross examination Houston said that he had never run a GC-MS test. *Id.*, p. 35. He agreed that a "drug test" might mean a simple procedure, not as detailed as a GC-MS test, and agreed there could be a difference between a clinical test and a laboratory test. *Id.*, p. 36. For example if he did a urine test it would involve putting litmus paper in the urine and looking for a color change to indicate whether a specific substance was there. *Id.*, pp. 36-37. Something might be a preliminary screening, and then a more detailed test could determine specific substances and quantities. *Id.*

Houston was shown the report (Ex. 1 in this hearing). *Id.*, p. 31. The laboratory report stated:

> The drug [urine] sample was analyzed for the following drugs or drug
> classes: amphetamines, barbiturates, *benzodiazepines*, cannabinoids,

> carisoprodol, cocaine metabolite, gamma-hydoxybutyric (GHB),
> methadone, opiates, *sedative hypnotic* and other drugs.

Ex. AA (Ex. 11 at trial) (emphasis added).  *Id.*, p. 38.  Houston agreed that Ambien is a

sedative hypnotic, but said that Ambien is only a derivative of benzodiazepine, it is not a

benzodiazepine.  *Id.*, pp. 37, 39.   He reasoned:

> You're looking at – we're saying benzodiazepines *is the sedative-hypnotic
> class that they tested for.*  What I'm saying is, Ambien, although it is a
> sedative-hypnotic, is not a benzodiazepine.

*Id.*, p. 39.  As far as Houston was concerned, "by saying benzodiazepine sedative-

hypnotic," the test ruled out Ambien.[15]  *Id.*, pp. 39-40.

Houston said that if a GC-MS test had been run on the urine sample and if

Zolpidem were in the sample, Zolpidem should have been identifiable.  *Id.*, pp. 40-41.

He reasoned that  the fact that Ambien was not mentioned in the report would indicate

that either there was no Zolpidem present or there was no test for it.  *Id.*, p. 41.

Houston said that the times given in his affidavit in 2006 (the hypothetical, that C.W. had

taken Ambien at 3:00 A.M. and urinated at 4:30 A.M.) were provided in the affidavit,

prepared by someone acting on Petitioner's behalf.  *Id.*, pp. 42-43.

---

[15] Benzodiazepine is any of a *group of drugs* having a common molecular structure and similar pharmacological activities, including antianxiety, muscle relaxing, and sedative and hypnotic effects.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at:  http://www.mercksource.com (Medical Dictionary link).  A sedative is an agent that decreases irritability, excitement, or nervousness, and it does this by depressing the central nervous system.  *Id.*  Sedatives are distinct from tranquilizers, which also have a calming effect but usually do not suppress bodily reactions.  *Id.*  A hypnotic causes sleep.  *Id.*  Thus, the class of drugs that are sedative-hypnotics is larger than the class of drugs that are benzodiazepines, and includes benzodiazepines.  Houston read the report as if the earlier reference to the class of benzodiazepines as limiting the class sedative-hypnotics.

Houston said that the half life of Klonopin[16] is four and a half to five hours, but then said he would not be surprised to learn it was actually 19-60 hours.  *Id.*, p. 44.  But Houston thought that while Klonopin has a longer half life than Ambien, they are both central nervous system (CNS) depressants, and there would be synergistic action going on between the two drugs.  *Id.*, pp. 44-45.  In other words, one could multiply or enhance the central nervous system effects of the other, but this had no effect upon whether either would be detectable.  *Id.*, pp. 45-46.  He thought that if Klonopin and Ambien were taken at about the same time they both should show in the same urine sample, even assuming they each has a different half life.  *Id.*  He said that this was so if the FDLE test detected Ambien at 150 nanograms or more per milliliter, assuming C.W. had taken Ambien when she said she did and only eliminated (urinated) once.  *Id.*, p. 46.

Asked if he would agree with an FDLE analyst saying that the absence of Zolpidem in urine nearly 13 hours after it was allegedly taken would be inconclusive, he said "I don't know, because I don't know whether the test that they would have been using was invalid."  *Id.*, p. 46.  Houston was asked:  "So you couldn't say whether the presence of Zolpidem would be evidence that Ambien has been taken, but its absence would not be evidence that it had not?  You don't have an opinion on that?"  *Id.*, pp. 46-47.  To which he responded "[n]o."  *Id.*, p. 47.

---

[16] As Dr. Menduni testified, Klonopin (clonazepam) is a benzodiazepine.  It is used as an oral anticonvulsant and as an antipanic agent for treatment of panic disorders.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS

I asked Mr. Houston a number of follow up questions about synergy between the two drugs and half life. He said as to synergy that he was talking about the effects upon the patient, not the continued chemical presence of the drug. *Id.*, p. 48. He explained that half life is when half of the drug has metabolized, and after the drug breaks down, it should still be detectable be in the urine. *Id.*, pp. 49-50. He said 65-75 percent is eliminated in the urine, and the rest is eliminated in the feces. *Id.*, p. 50. He said that even after breaking down, the drug stays in the body until it is eliminated in the urine or feces. *Id.* "All of them [drugs] do." *Id.*

He said if the half life is one and a half to two hours, and a person urinates two and a half hours after taking it, the drug should remain present in the urine until the next time the bladder is voided. *Id.*, p. 51. After that (another urination), it is possible that it will have dissipated. *Id.* It was his opinion that at the time that the rape kit was taken, there should have been traces of Ambien in C.W.'s urine and those traces should have been detectible in a test. *Id.*, pp. 51-52.

Houston did not believe that much of the drug would be burned up through the metabolic process or sweating in part because there would not be such activity after taking Ambien, since it causes sleep. *Id.*, p. 52. Houston explained:

> I have done a lot of research since that time, and this drug is a very – a drug that is not very strong in its metabolites. So, when it breaks down, it breaks down and sometimes it dissipates in the system, but it still should be in the urine for the length of time that this particular case indicates, and it is detectible through tests.

*Id.*, p. 58.

Theresa Flury, who was Petitioner's co-counsel with Whisnant in this case, testified that she cross examined C.W. and made closing argument. *Id.*, p. 61. Flury

said the central issue was whether the victim was credible, and the central point of

C.W.'s credibility was whether she took Ambien. *Id.* She said they (defense counsel)

had been told prior to trial that they (the prosecution or FDLE) could not test for Ambien.

*Id.*, pp. 62-63. Flury, like Whiznant, did not provide credible specifics for this assertion.

Flury said that in her closing argument, she asked the jury to consider the lack of

evidence as to whether C.W. took Ambien, "specifically, we had no extrinsic evidence to

prove whether or not she was telling the truth with Ambien." *Id.*, p. 62. And "after I

argued that in my closing argument, the state attorney then got up and said, 'Yeah, but

we all know there is no test for Ambien, so she couldn't product it.' " *Id.*

On cross examination, when reminded that she asked only two or three

questions about Ambien in her cross examination of C.W., Flury said that this was:

> because, knowing what her answer was, that she had said that she had
> taken it, and we didn't have a test, no, it's not that it wasn't important; but,
> when you're told that there is no test, and you have nothing to back it up,
> you don't want to look like you're actually beating up on a witness that
> you're not going to be able to prove otherwise. So there were other areas,
> quite frankly, what she remembered about that evening, and what she
> didn't, and that's what I focused on. But it had nothing to do with whether
> or not Ambien was important.

*Id.*, p. 65. Asked on redirect, Flury agreed that if the jury had known there was a test to

detect the presence of Ambien, it "[a]bsolutely would have made a difference," and

"would have been a game changer." *Id.*, pp. 66-67. She explained:

> Because then – well, we always say that, especially when – that was the
> one drug that she said she took that made her not aware. And so we said,
> if you can't believe her that she took the Ambien, then how could you
> believe any other part of her testimony.

*Id.*, p. 67.

The following was on re-cross:

Q.     What if the analyst who performed the urinalysis had said,
       yes, we tested for Ambien; no, no Ambien was found, but
       that is – there is no conclusion that can be drawn from that
       as to whether she took Ambien or not, given Ambien's
       extremely short half-life, would that have helped or hurt your
       case?

A.     I don't mean to sound obnoxious or arrogant.  *But given all
       the jury trials that I have done, when an expert says that you
       can test for something, the jury wants to know if it's there.*

*Id.*, p. 67 (emphasis added).

Flury would not agree that her defense would have been undermined had Zeller had testified that there was a test, they tested for but did not find Ambien, but that the negative result was inclusive.  *Id.*, p. 68.  She explained: "Because, if we could say, yes, there is a test, and it's not there, and it doesn't show one way or the other, we still have that there was that lack of evidence."  *Id.*  She thought that this evidence would have then made the timing of the taking of Ambien important, and other factors may have arisen, but was not sure.  *Id.*

Lisa Zeller testified regarding her FDLE report on the urine specimen taken from C.W., Petitioner's Ex. 1.  *Id.*, p. 71.  She said the substances identified, in layman's terms, were an amphetamine (often prescribed for weight loss or hyperactivity), 7-Aminoclonazepam or Klonopin, "a benzodiazepine in the same group with Xanax and Valium," and diphenhydramine, which "is the major component of a cold medicine called Benadryl."  *Id.*, p. 72.  She said she did a comprehensive test and the test did not identify Ambien in the sample.  *Id.*  Had Ambien been identified, Zeller said she would have listed this substance as Zolpidem on the lab report.  *Id.*, pp. 72-73.

Zeller identified an FDLE case tracking form, marked as Petitioner's Ex. 2. *Id.*, p.

73. It showed that the evidence was received from Diane Anderson on September 17,

2002, and Zeller's initials (LAZ) appear at the end of the line starting with October 3,

2002. *Id.* She said typically she writes notes about the case or phone calls; on that day

she wrote, "Ambien (2 AM), Tylenol PM, Darvocet according to the medical chart, and

Klonopin per Detective Furuseth." *Id.*, pp. 73-74 and Ex. 2. She said that these were

the substances Detective Furseth told her she should look for in the urine sample.[17] *Id.*,

p. 74. Furseth asked her to search for Ambien and Darvocet, which she did not find, but

she did find the Tylenol PM and Klonopin, as reflected on Ex. 1 (lab report). *Id.* She

submitted the report (Ex. 1) to Diane Anderson (with the Tallahassee Police

Department), who would have given it to the state attorney. *Id.*, p. 75.

Zeller said "there was a test in place to identify Ambien" on October 9, 2002

(when she produced the test results), and if someone said there was no test, "[t]hat

would be incorrect." *Id.*, p. 75.

On cross examination, Zeller was recognized as an expert in the field of

toxicology and pharmacology. *Id.*, pp. 77-78. She said the first test done in this case

was "an immunoassay test, which is a screening test. . . . And then further testing

would be involving a gas chromatograph, mass spectrometer." *Id.*, p. 78. She

described GC-MS testing, and said it is very sophisticated. *Id.*, pp. 78-79. She said the

---

[17] The Government has not argued that the defense was provided with a copy of the case tracking form, Ex. 2, prior to trial, and has not submitted any evidence to that effect, so it must be assumed that it was not given to Petitioner prior to trial. That form references an attached request from Jim Anderson, SAO (state attorney's office, I presume) which is not attached to Ex. 2.

test was used by most crime laboratories to identify suspected drugs. *Id.*, p. 80. Less

expensive drug screening tests are used in other situations, like workplace drug testing.

*Id.*, p. 79. Zeller did not know if there is or was in 2003 any test for Ambien other than

the GC-MS test. *Id.*, p. 80. She said if someone was asked in 2003 if there were a test

for Ambien, and the person understood the question to be asking whether a simple

screening test existed for Ambien (rather than the GC-MS), the answer would be no.

*Id.*, p. 80.

Zeller said Ambien is a sedative-hypnotic, used as a sleeping agent. *Id.*, p. 80.

She said she tested for sedative-hypnotics, and Ambien was not identified in the urine

sample, as she did not find a detectible amount of Ambien metabolites in the specimen.

*Id.*, p. 81. She said "Ambien was not identified in the urine sample," and that

Petitioner's Ex. 1 "[r]eflects that I did not find Ambien." *Id.*

Zeller said that a half-life is the "time that it takes for half of the drug to disappear

from the system. And so usually it's used to gauge detection in the urine, how long you

would expect to see it in the sample." *Id.*, p. 82. At another point, she said that a half

life is the time in which one expects half the drug to be "gone away from the blood." *Id.*,

p. 94. She said that typically one expects a drug to disappear from the body after five

half-lives. *Id.*, p. 95. She said that if the half-life were two hours, one expects the drug

to disappear from the body in ten hours. *Id.* She said it depended on the person. *Id.*

Zeller said that a drug will disappear from the body through metabolism and

excretion. *Id.*, p. 82. She said that even when the drug has moved into the bladder, the

metabolic process continues; the bladder is not like a "Tupperware" container. *Id.*, p.

86. She said: "But there's still, like I said, metabolic processes taking place in the body,

even if a person is not urinating." *Id.*, p. 88. In response to my questions, Zeller said that metabolism takes place in the liver, not the bladder, but the bladder is porous, and a drug will past back into the blood stream from the bladder and on to the liver for additional metabolism, before returning to the bladder in urine. *Id.*, pp. 98-99.

Zeller said that Ambien has a half life of one and a half to four and a half hours, and Klonopin has a half life of 19 to 60 hours. *Id.*, p. 82. She said if a person took Ambien and Klonopin at the same time, and the person did not regularly take Ambien (taking it "on an as-needed basis"), but took Klonopin regularly, she would reasonably expect to identify Klonopin in the system longer than Ambien. *Id.*, p. 83. The same would be true if the person took both drugs only on an as-needed basis. *Id.* The same would be true if the person took Klonopin regularly, but took Ambien only occasionally. *Id.*, p. 87. Zeller said she would not expect that the Klonopin and Ambien would act together in any way symbiotically to change their detectability, though there could be "additive effects" on the person taking them. *Id.*, p. 84.

Zeller was assume hypothetically a person who is said to have taken[18] Ambien and Klonopin on an as-needed basis, takes both around 3:15 A.M., urinates at 4:30 A.M., does not urinate again until 3:48 P.M. when the urine sample is collected, and that person's urine tests positive for Klonopin metabolites but not Ambien metabolites using a GC-MS test. *Id.*, pp. 84-85. Zeller said the test would be conclusive that the Ambien metabolites were not detected, but inconclusive as to whether or not such a person

---

[18] This is a rewording of the hypothetical in the way I am sure Zeller understood it. Zeller was actually asked to assume that the person actually *took* Ambien (along with Klonopin), doc. 35, p. 84, which renders the hypothetical for these purposes meaningless.

actually took Ambien at 315 A.M. *Id.*, p. 85. She said that even if the person had urinated twice before the urine sample was taken at 3:48 P.M., the result (whether the person took Ambien earlier) would still be inconclusive. *Id.*, p. 91. She also said that since metabolism continues in the bladder, and would do so to diminish the detectable Ambien even if the person had not urinated at all. *Id.*, p. 86.

Zeller said that Valium has a long half life, and some of the metabolites are active drugs which have long half lives. *Id.*, pp. 88-89. In contrast, the metabolites for Ambien are inactive, and there was no way to detect the metabolites of Zolpidem. *Id.*, p. 90. She said that instead, she detects Zolpidem itself. *Id.* Zeller said she never told anyone there was no test for Ambien. *Id.*

Zeller said she also did a test of blood taken from the victim in this case, which would be to confirm any drugs found in the urine, but typically more drugs can be identified in the urine and stay in the urine longer. *Id.*, pp. 92-93. She used the GC-MS test on the blood sample, and Ambien was not detected in the sample. *Id.*, pp. 93-94.

Zeller agreed it would be wrong to say FDLE does not test for Ambien, and said "I looked for Ambien in this case, and I do have a test for it." She agreed that while the lack of a result for Ambien might be ambivalent, it was not because no test had been done. *Id.*, p. 96.

I asked Zeller if Exhibit 1 was the result of the GC-MS, and she said, "[y]es. It's a gas chromatograph, mass spectrometer. That's my confirmatory test." *Id.*, pp. 96-97. I asked "[t]hat's what this is, this Exhibit 1 is the results of that?" *Id.*, p. 97. She responded, "[i]t's the culmination of everything; but, yes, the final test was the gas chromatograph, mass spectrometer." *Id.* I asked whether listing sedative-hypnotics in

the substances tested for should have alerted a reader of the report that she tested for

Ambien. *Id.* This exchange followed:

>   A.   Well, there are many different sedative-hypnotic type drugs.
>        So I'm saying that I did a comprehensive test, and I tested
>        for all of these things and other drugs, and other sedative-
>        hypnotic drugs, because I can't possibly list out every single
>        drug that was tested for.
>
>   Q.   Okay. My question is fairly simple. When you wrote
>        "sedative-hypnotics," among the sedative-hypnotics that you
>        were telling the prosecutor that you tested for, you were
>        saying, yes, I tested for Ambien.
>
>   A.   I don't know if I ever specifically said that –
>
>   Q.   No. But that's the way you told the prosecutor on the paper;
>        is that correct?
>
>   A.   Well, yes, Ambien is a sedative-hypnotic.
>
>   Q.   Right. In your field of toxicology, that's how you talk about it.
>
>   A.   Yes.

*Id.*, pp. 97-98.

Respondent then called Albert Menduni, M.D. Dr. Menduni said when he

testified at trial that there was no test for Ambien, he was not referring to a GC-MS test.

*Id.*, p. 100-101. He said he "was referring to the test available to a clinician," ordered

"from clinical laboratories. *And the clinical laboratories I always dealt with*, there was no

test for Ambien." *Id.*, p. 101 (emphasis added). Dr. Menduni was aware at trial of the

GC-MS test, and said "gas chromatography, mass spectrometry will pick up anything,

literally." *Id.* He repeated that he was referring to tests as available to clinicians, which

he called a "screening" test, and he was not aware of any such test for Ambien. *Id.*, p.

102. He was not aware of what kind of testing FDLE used, and he had nothing to do

with the FDLE testing.  *Id.*  He said: "I was the wrong person to ask that, since I had

nothing to do with the testing."  *Id.*

Dr. Menduni said that with GC-MS, "the problem with that is it picks up

everything.  So, when you get results off of that, you have to know what you are looking

for, okay?"  *Id.*, p. 103.  He explained the GC-MS process, and said "[w]ithout knowing

what you're looking for, it's very hard to interpret what comes off a gas chromatograph."

*Id.*  Dr. Menduni said:

> if I had been asked, could a metabolite of Ambien been picked up by any
> test available, I would have said, yes; and that would have been by gas
> chromatography, mass spectrometry, or by testing specifically from the
> company that makes Ambien.  They develop their own proprietary test at
> the time to measure their substances when they did their clinical trials.
> But I was not asked that.
>
> And part of the reason – I've thought about this question, because I was
> asked this before the trial – is I was maybe prejudiced against mentioning
> that kind of material, because I had – at previous times I had dealt with
> parole officials here in town, and they run the absolute cheapest of
> screening tests.  In fact, they made several errors because of that, in my
> opinion.
>
> So I would think – I didn't think that – I was prejudiced against the idea
> that there was no – the company, or the county or the state would spend
> the money to do a direct gas chromatography. . . .
>
> I was thinking about what had been done by the parole officials, okay?
> But even beyond that, I didn't realize that forensically the forensic testing
> done by the criminal justice system, actually, went right to gas
> chromatography.  Again, unless you know what you're looking for, it is
> very difficult to identify the substances that is [sic] coming off of the gas
> chromatography.

*Id.*, pp. 104-105.

Deborah Whisnant was recalled by Petitioner.  She said that she and co-counsel

Flury practiced with Petitioner in preparation for trial, should he decide to testify, and

she was concerned he would not be a great witness because he did not answer

questions without trying to explain. *Id.*, p. 107. She said there were times leading up to

trial when he wanted to testify and times he did not, which was pretty common. *Id.*, p.

108. Petitioner made the final decision not to testify during trial, after talking to his

father about it. *Id.*

**Legal analysis**

**Standard of Review**

This court's review is limited by the AEDPA.[19]

> Under AEDPA, if the state court had addressed [petitioner's] *Brady* claims
> on the merits, [the court] could not grant him relief unless the state court's
> decision was: (1) "contrary to, or involved an unreasonable application of,
> clearly established Federal law, as determined by the Supreme Court of
> the United States; or (2) . . . based on an unreasonable determination of
> the facts in light of the evidence presented in the State court proceeding."

Hammond v. Hall, 586 F.3d 1289, 1306 (11th Cir. 2009) (quoting 28 U.S.C. § 2254(d),

other citation omitted) (since the state court treated the Brady claim as a claim of

ineffective assistance of counsel, it failed to address the claim and the district court

properly considered it *de novo*).

Petitioner's Brady and Giglio claims were summarily rejected by the trial court

because the lab report itself was introduced by stipulation, also noting that Petitioner

"could have presented direct evidence that [C.W.] didn't consume medication." It may

be that the trial court was applying the state rule for granting a new trial, that there was:

> New and material evidence, which, if introduced at the trial would probably
> have changed the verdict or finding of the court, *and which the defendant*

---

[19] The Antiterrorism and Effective Death Penalty Act of 1996.

*could not with reasonable diligence have discovered and produced at the
trial, has been discovered.*

Fla.R.Crim.P. 3.600(a)(3) (emphasis added).  Assuredly, a Florida defendant may not

complain of "new" evidence under this Florida rule if he stipulated to it at trial.  If that

was the basis of the state court's ruling, then plainly that court did not address the

federal claims.  It addressed only a state law issue.[20]

Perhaps, however, the state court rejected the Brady and Giglio claims by

application of conventional rules of waiver, that is, by stipulation and trial strategy (not

calling Petitioner as a witness).  It is possible that the court's reference to the stipulation

was an agreement with the prosecutor's argument that Petitioner could have no Brady

and Giglio claims if he had an equal opportunity to discover the fact that a test had been

run for Ambien.  As will be explained ahead, that is a proper basis to reject a Brady

claim.  A defendant has no Brady claim if the evidence is equally available to both

parties.  Thus, assuming this was the basis for the state court's ruling, the decision is

entitled to § 2254(d)(1) deference to this extent.

The Giglio claim fares differently.  It is difficult to see how principles of waiver

could have any effect upon a claim that the prosecution knowingly used (or failed to

correct) false evidence at trial and did not tell Petitioner about the falsity.  The state

court completely overlooked the Giglio claim.  Federal law is clearly established for a

_____

[20] If the court were to so find, and since this judgment was affirmed without
opinion, the decision would not be entitled to deference under § 2254(d), and would be
reviewed *de novo*.  *Id.*, at 1306; Cone v. Bell, 566 U.S. __, 129 S.Ct. 1769, 1784, 173
L.Ed.2d 701 (2009) (because state courts did not reach merits of *Brady* claim, review
was not subject to the deferential standard of § 2254(d); "[i]nstead, the claim is reviewed
de novo.") (citations omitted).

<u>Giglio</u> claim and the state court did not discuss any of that law, or perceive a distinction

between a <u>Brady</u> claim and a <u>Giglio</u> claim. Thus, this court should review the claim *de novo*.

In this case, however, it does not matter. It is my view, as will be discussed

ahead, that the state court's ruling has "resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined

by the Supreme Court of the United States." § 2254(d)(1).

The ineffective assistance of counsel claim was reviewed on the merits under

<u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and

the state court's adjudication is entitled to deference under § 2254(d).

**Legal Analysis**

 **<u>Brady</u> and <u>Giglio</u> claims**

 <u>Brady</u> held that "the suppression by the prosecution of evidence favorable to an

accused upon request violates due process where the evidence is material either to

guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

<u>Brady</u>, 373 U.S. at 87, 83 S.Ct. at 1196-97.

> The Court later clarified that a defendant need not request favorable
> evidence from the State to be entitled to it. *United States v. Agurs*, 427
> U.S. 97, 103-07, 96 S.Ct. 2392, 2397-99, 49 L.Ed.2d 342 (1976).

<u>Smith v. Sec'y for the Dep't of Corr.</u>, 572 F.3d 1327, 1333 (11th Cir. 2009).

 <u>Giglio</u> claims are one of two types of <u>Brady</u> violations:

> The first category of [*Brady*] violations, often called (and what we will call)
> *Giglio* claims, occurs where the undisclosed evidence reveals that the
> prosecution knowingly made false statements or introduced *or allowed*
> *trial testimony that it knew or should have known was false.* *Agurs*, 427
> U.S. at 103-04, 96 S.Ct. at 2397-98; *Giglio v. United States*, 405 U.S. 150,

153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (noting that the same rule
applies when "the State, although not soliciting false evidence, allows it to
go uncorrected when it appears.") (internal quotation marks omitted);
*United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir.1995) (the *Giglio*
rule applies to "explicit factual representations by the prosecutor at a side
bar and implicit factual representations to the jury" while questioning a
witness). Under this category of *Brady* violations the defendant is entitled
to a new trial "if there is any reasonable likelihood that the false testimony
could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103, 96
S.Ct. at 2397. The "could have" standard requires a new trial unless the
prosecution persuades the court that the false testimony was "harmless
beyond a reasonable doubt." *Ford v. Hall*, 546 F.3d 1326, 1332 (11th Cir.
2008) (*quoting Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828,
17 L.Ed.2d 705 (1967)). This standard favors granting relief. It is shaped
by the realization that "deliberate deception of a court and jurors by the
presentation of known false evidence is incompatible with rudimentary
demands of justice." *Giglio*, 405 U.S. at 153, 92 S.Ct. at 766 (internal
quotation marks omitted).

Smith, 572 F.3d at 1333-34 (emphasis added). *See also* Hammond v. Hall, 586 F.3d

1289, 1306-07 and n. 4 (11th Cir. 2009) (Giglio is a type of Brady claim with a more

defense-friendly materiality standard).

The claims here include both types. The laboratory report, Exhibit 11, did not

mention Ambien or Zolpidem by name, and the term "sedative-hypnotic" was

unexplained in the report. The State, however, knew (through Zeller) that a test had

been run to detect Ambien and the result was negative. It is Petitioner's contention that

the State had an affirmative obligation to inform Petitioner of this evidence before trial.

This is a Brady claim.

When the State elicited evidence from Dr. Menduni that there was *no* test for

detection of Ambien, and then relied upon this testimony in closing statements to the

jury, Petitioner asserts that a Giglio claim arose. The claim arose not because the

prosecutor herself knew that this was false evidence, but because the prosecutor

should have known that these representations were false since Zeller, working for the FDLE, had performed the test for the State.

### **Brady** claim

"*Brady* does not oblige the government to provide the defendants with evidence that they could obtain from other sources by exercising reasonable diligence." United States v. McKenzie, 768 F.2d 602, 608 (5th Cir. 1985), *cert. denied*, 474 U.S. 1086 (1986); United States v. White, 846 F.2d 678, 692 (11th Cir. 1988), *cert. denied*, 488 U.S. 984 (1988).

I do not find that any agent of the State told Petitioner's attorneys (Whiznant and Flury) *prior to trial* that there was no test for Ambien, so the State did not cause an impediment to discovery prior to trial. The testimony from Flury and Whiznant was too vague on this point to make such a finding. Neither talked with Zeller, and neither said that the information before the trial that, there was no test for Ambien, came from the prosecutor, Lotane. Brown was not deposed prior to trial and the evidence indicates that Brown never told Petitioner's attorneys that there was no test for Ambien.[21] The laboratory report itself was silent on the issue. It is possible that the fact that Ambien was not listed in the laboratory report as a substance that Zeller looked for caused both the prosecutor and Petitioner's attorneys to believe that there had been no test conducted for Ambien. But on that score, both sides were equally situated. It is clear,

---

[21] Brown denies having ever said anything about a test for Ambien. Doc. 36, Ex. JJ. Whiznant said in the hearing on the motion for a new trial that she listened to the tape of Brown's *trial* testimony, and Brown did not testify as to the lack of a test for Ambien. Ex. BB, p. 16. Whiznant said in her motion for a new trial that she had thought that Brown had so testified.

however, that prior to the trial, the *prosecutor* thought that there was no test for Ambien because she elicited that testimony from her witness, Dr. Menduni.  I cannot conclude on this evidence, however, that, as a consequence of some misconduct or direct misinformation by the State, Petitioner's attorneys prior to trial also thought that there was no test for Ambien.

Thus, Petitioner's attorneys had equal access to Zeller's evidence.  They reasonably could have contacted Zeller and discovered that a test had been run for Ambien.  To this extent, the state court's rejection of Plaintiff's <u>Brady</u> claim did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

**<u>Giglio</u> claim**

**Procedural default**

Respondent asserts now that the contention that Petitioner was convicted based on perjured testimony has never been raised in state court and is procedurally defaulted. Doc. 42, pp. 15-18. The claim is not defaulted. See the discussion above regarding the motion for a new trial, pages 22-23. While <u>Giglio</u> was not cited, Petitioner's attorney alleged facts raising a <u>Giglio</u> claim, that instead of revealing these exculpatory facts, "the state elicited testimony to the contrary at trial" in its examination of Dr. Menduni (that there was *not* a test for Ambien), and that when Houston was asked about it the prosecution objected. Ex. C, p. 106. Petitioner cited <u>Craig v. State,</u> 685 So. 2d 1224 (Fla. 1996) as holding that "a prosecutor has the obligation to correct testimony presented by a witness if the prosecutor knows the testimony is false, and the testimony is material." *Id.* <u>Craig</u> was a Florida Supreme Court case applying <u>Giglio</u>. 685 So. 2d at 1226. <u>Giglio</u> was cited on appeal.

**Knowing use of false evidence**

This is not a case where the prosecutor personally knew that she had elicited perjured testimony, but neither was <u>Giglio</u>. "Knowing" in this context is not specific intent. It is a term of art for the collective "knowledge" of the State. The false testimony at issue in <u>Giglio</u> was that no one had promised the alleged co-conspirator that he would not be prosecuted if he testified. The prosecutor argued in closing that this witness received no promise that he would not be indicted. 405 U.S. at 151-152, 92 S.Ct. at 764-765. As raised there in a motion for new trial, the Assistant United States Attorney who presented the case to the grand jury had promised the witness he would

not be prosecuted, and this promise was implicitly confirmed by the United States

Attorney.  *Id.*, at 152-153 and nn. 2 and 4, 92 S.Ct. at 765 and nn. 2 and 4.  The case

was tried by another Assistant United States Attorney, however.  That assistant, who

elicited the testimony and made the argument, did not know the testimony to be false.

*Id.*, and n. 3, 92 S.Ct. at 765 and n. 3.[22]  The Supreme Court in <u>Giglio</u> reasoned:

> In the circumstances shown by this record, neither [the assistant's]
> authority nor his failure to inform his superiors or his associates is
> controlling.  *Moreover, whether the nondisclosure was a result of
> negligence or design, it is the responsibility of the prosecutor.*  The
> prosecutor's office is an entity and as such it is the spokesman for the
> Government.  A promise made by one attorney must be attributed, for
> these purposes, to the Government.

At 154, 92 S.Ct. at 766 (emphasis added).

> Thus, the rule has developed that:

> . . . the individual prosecutor *has a duty to learn of any favorable evidence
> known to the others acting on the government's behalf in the case*,
> including the police.  But whether the prosecutor succeeds or fails in
> meeting this obligation (whether, that is, a failure to disclose is in good
> faith or bad faith, *see Brady*, 373 U.S., at 87, 83 S.Ct., at 1196-1197), the
> prosecution's responsibility for failing to disclose known, favorable
> evidence rising to a material level of importance is inescapable.

<u>Kyles</u>, *supra* n. 12, 514 U.S. at 437-38, 115 S.Ct. at 1567-68 (emphasis added); <u>Moon</u>

<u>v. Head</u>, 285 F.3d 1301, 1309 (11th Cir. 2002) (quoting this language).  *See also* <u>Banks</u>

<u>v. Dretke</u>, 540 U.S. 668, 124 S.Ct. 1256, 1273 157 L.Ed.2d 1166 (2004) ("the State

knew of, but kept back, [the witness's] arrangement with [the sheriff]," citing <u>Kyles</u> to

support the proposition that a prosecutor is responsible for favorable evidence known by

---

[22] The lawyer who tried the case averred that the other assistant (who presented
the case to the grand jury) advised him the witness had not been granted immunity, but
was not indicted because he was very young and "obviously had been overreached" by
the defendant.  *Id.*, at 152, n. 3, 92 S.Ct. at 765, n. 3 (quoting from the affidavit).

police); <u>United States v. Meros</u>, 866 F.2d 1304, 1309 (11th Cir. 1989) ("*Brady* and its progeny apply to evidence possessed by a district's "'prosecution team,' which includes both investigative and prosecutorial personnel.") (citation and footnote omitted).

Respondent argues that "the [<u>Giglio</u>] claim is simply wrong," that Dr. Menduni explained his trial testimony at the § 2254 evidentiary hearing, that he meant there was no clinical test for Ambien readily available to physicians, and did not know that FDLE had conducted GC-MS testing at the time of trial. Doc. 42, pp. 18-19. Dr. Menduni's testimony was not false, it is argued, because he was not asked the right question at trial. Respondent asserts that this claim is an attempt to shift blame for the failure to ask the right questions of the right witness. *Id.*, pp. 19-20.

Dr. Menduni knew that a GC-MS test existed and would detect Ambien, but he limited his answer to the law enforcement tests commonly made available to himself as a practicing physician. When asked if there was "a test" for Ambien, he said no. In context, Dr. Meduni's testimony was incomplete and false because he did not then reveal that he was aware of the GC-MS test for Ambien. Dr. Menduni testified before me that he was the wrong witness to ask that question, but it was *the prosecutor*, not Petitioner, who asked the question and Dr. Menduni was the State's witness.[23] The prosecutor made it worse in closing, reminding the jury that there was no "test" for Ambien. Ex. Z, p. 368. The prosecutor used Zeller's laboratory report as a central piece of evidence, but apparently never asked Zeller what it meant. The laboratory

---

[23] Respondent argues (and the prosecution argued at trial) that Houston was not qualified to testify because he was not familiar with testing used by FDLE. But neither was Dr. Menduni, who testified at trial that he knew of no test for Ambien. The State cannot have it both ways.

report, State's Ex. 11 and Ex. 1 at my evidentiary hearing, did not mention Ambien or

Zolpidem by name at all, even though the detective had asked Zeller to look for those

drugs.[24]  Under the caselaw discussed above, the prosecutor "knew" what Zeller knew

because she (the prosecutor) should have known.  Respondent's argument that the

claim is "simply wrong," which is an argument that false evidence was not presented at

Petitioner's trial, is not persuasive.  This case involved the "knowing" use of false

evidence by the State.

### Materiality

The remaining <u>Giglio</u> issue is whether the evidence was material.  Materiality for

a <u>Giglio</u> claim is different from a <u>Brady</u> claim,[25] as already discussed above.  For a

---

[24] It would have been helpful had Zeller extended the narrative of the report to state exactly what drugs the detective asked her to look for and the results for each named drug.  In that way, there would have been closure between the detective's request and Zeller's results.

[25] <u>Brady</u> uses the ineffective assistance of counsel standard in <u>Strickland</u>.

The prejudice component of an ineffective assistance claim and the materiality component of a *Brady* claim both require the same thing:  the petitioner must establish that but for the deficient representation or suppression, there is a reasonable probability of a different result in the proceeding.  *Compare Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068 *with Kyles v. Whitley*, 514 U.S. 419, 433-34, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995).  If the failure to use certain evidence does not result in prejudice for ineffective assistance purposes, the suppression of some of that same evidence will not be material for *Brady* purposes.

<u>Brown v. Head</u>, 272 F.3d at 1316 (11th Cir. 2001).  *See also* <u>Bagley</u>:

The evidence is material [under <u>Brady</u>] only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

Giglio claim, a falsehood is material "if there is any reasonable likelihood that the false

testimony could have affected the judgment of the jury." Brown v. Head, 272 F.3d at

1317 (citations omitted).

> Since its decisions in *Napue* and *Giglio*, the Supreme Court "has
> consistently held that a conviction obtained by the knowing use of perjured
> testimony is fundamentally unfair, and must be set aside *if there is any
> reasonable likelihood that the false testimony could have affected the
> judgment of the jury.*" *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct.
> 2392, 2397, 49 L.Ed.2d 342 (1976) (footnote omitted) (emphasis added);
> *see also Kyles v. Whitley*, 514 U.S. 419, 433 & n. 7, 115 S.Ct. 1555, 131
> L.Ed.2d 490 (1995); *United States v. Bagley*, 473 U.S. 667, 677, 105 S.Ct.
> 3375, 87 L.Ed.2d 481 (1985).
>
> The "any reasonable likelihood" standard differs from the materiality
> standard applicable to other types of *Brady* violations because of the
> nature of the error.  As the Supreme Court has explained, "the Court has
> applied a strict standard of materiality [to *Giglio* violations], not just
> because they involve prosecutorial misconduct, but more importantly
> because they involve a corruption of the truth-seeking function of the trial
> process." *Agurs*, 427 U.S. at 104, 96 S.Ct. 2392; *accord United States v.
> Alzate*, 47 F.3d 1103, 1110 (11th Cir.1995).

Ventura v. Attorney General, 419 F.3d 1269, 1278 (11th Cir. 2005) (emphasis added,

footnote and citations omitted).

> As far as *Giglio* materiality is concerned, the clearly established law of the
> Supreme Court is simply that reversal of a conviction is required when
> "there is any reasonable likelihood that the false testimony could have
> affected the judgment of the jury."

419 F.3d at 1279.

United States v. Alzate, 47 F.3d 1103 (11th Cir. 1995) sets forth the proper

course for this court.  In that case, the defendant presented a duress defense, claiming

that he had drugs in his suitcase because he was placed on a plane in Colombia with

---

473 U.S. at 682, 105 S.Ct. at 3383.

the suitcase by some men who had previously threatened him over a debt. *Id.*, pp.

1104-1105. The Government presented the testimony of an agent who interviewed the

defendant at the airport; the agent said that defendant admitted he was paid $8,000 to

transport the cocaine. *Id.*, at 1105. The defense attempted to explain this as a

misunderstanding because defendant had difficulty speaking English and the agent

spoke very little Spanish. *Id.* The defendant testified that the agent referred to *another*

box of cocaine in the interview room and asked him how much he thought someone

would be paid to transport that box, and defendant guessed $8,000. *Id.*, at 1105-06.

The agent said during cross examination that he did not recall another arrest that day

that might have given rise to another box of cocaine, and the prosecutor objected to

various attempts by the defense to introduce evidence about the "other box" of cocaine.

*Id.*, at 1106. At a sidebar during defendant's testimony, the prosecutor said he had "an

extremely serious problem with this testimony. There was no other seizure that day,"

and argued that defendant was fabricating testimony. *Id.*

That evening the agent started wondering whether there had been another

seizure that day, checked his records, and discovered there had been another box of

cocaine in the room during the interview. *Id.*, at 1107. He told the prosecutor the next

morning that indeed another box of cocaine had been in the interview room. The

prosecutor did not disclose this evidence to the court or to the jury. *Id.*, at 1107-08. He

did not mention the box in his closing statement, but argued repeatedly that defendant

transported the cocaine for the purpose of receiving $8,000 in payment. *Id.*, at 1108.

While the jury was deliberating, defense counsel asked the agent why he had not been

called as a rebuttal witness to say the box did not exist, and the agent told him the truth,

that there was another box. *Id.* The matter was brought to the court's attention at about the same time the jury reached its verdict, so the court advised the defense to move for a new trial if the verdict was guilty, which it was. *Id.*

The court discussed the different standards of materiality for failure to disclose favorable evidence (citing <u>Brady</u> and <u>Bagley</u>), and for use of perjured testimony or failure to correct what was learned to be false testimony (citing <u>Agurs</u>, <u>Giglio</u>, and <u>Napue</u>). *Id.*, at 1109-10 (citation and footnote omitted). The court said:

> The cited decisions deal with false testimony. We do not have that in this case. Instead, we have explicit factual representations by the prosecutor at a side bar and implicit factual representations to the jury during cross-examination of the defendant. However, the reason the lower materiality burden applies where there is knowing use of perjured testimony is that such a situation involves prosecutorial misconduct and a corruption of the truth-seeking function of the trial. This case involves prosecutorial misconduct and a corruption of the truth-seeking function as well, albeit through somewhat different means. Accordingly, we agree with the government's concession that the *Napue/Giglio* materiality standard is the proper one for this case.

*Id.*, at 1110 (citations and footnote omitted). In other words, the court recognized that it was dealing with false representations by the prosecutor, not false testimony, but the analysis was the same.

The court said the weight of evidence as to knowing importation of cocaine "is not where the line of contention was drawn at trial, and it is not where our materiality focus should be." *Id.* The only issue was the duress defense, and the agent's trial testimony was damaging to the defense. *Id.* The court concluded: "It may be that Alzate's duress defense does not amount to much, but he is entitled to put his defense forward free of the prosecutorial misconduct that occurred in this case." *Id.* (citation omitted).

In the case at bar, the jury was not informed that the laboratory expert was specifically asked to test for Ambien. The jury was not informed that there was a laboratory test to detect Ambien in urine, and that C.W.'s urine samples was subjected to the GS-MS test. Finally, the jury was not informed that the test did not detect Ambien C.W.'s urine sample.

Had this evidence been presented to the jury, the state could have argued that the test was inconclusive and failed to show C.W. did not take Ambien. Petitioner could have argued that the test would have detected Ambien despite the short half life of the drug, because C.W. had taken other drugs which depressed her central nervous system and slowed her metabolism. Petitioner could have argued that if a 3 hour average half-life (1.5 hours plus 4.5 hours = 3 hours) was the proper half-life for Ambien in this case, then in the 12 hour period between taking Ambien and collection of the urine sample for testing, only 4 half-lives would have elapsed. Since it takes 5 half-lives for a drug to dissipate entirely from the urine, Ambien should have been detected. Both sides had witnesses (Zeller and Houston) who could have testified for both conclusions. Defense counsel also might have retained a toxicologist or another witness better qualified than Houston to discuss GC-MS testing and results.

Respondent argues that "this Court should entirely discount the testimony of Theodore Houston as lacking in credibility," because it was "riddled with contradictions," was in part "entirely nonsensical," his affidavit was "based purely on speculation outside Mr. Houston's knowledge," and he was not qualified to testify as an expert in toxicology to render an opinion on whether Ambien would be detectible in a test. Doc. 42, pp. 2-3, n. 1. As noted above, neither was Dr. Menduni, and the State cannot have it both ways.

But even if it could, it was for the jury to decide, to weigh the credibility of the witnesses. The issue is whether the evidence could reasonably have affected the judgment of the jury, not whether there was sufficient evidence to convict. "The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict." Kyles, 514 U.S. at 435, 115 S.Ct. at 1566. "This rule is clear, and none of the *Brady* cases has ever suggested that sufficiency of evidence (or insufficiency) is the touchstone." *Id.*, n. 8.

It does not seem to be seriously contested that had C.W. not taken Ambien as she testified, she would not have been unconscious when Petitioner had sexual intercourse with her. Unconsciousness was an element of the offense, and the State had the burden to prove this element beyond a reasonable doubt. The testing evidence could not have been more central to the prosecution's case.

Further, the truth as to the laboratory report was important as to C.W.'s credibility. If C.W. had not taken Ambien as she asserted, her credibility for other testimony would have been eroded.

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. *The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.*

Napue v. People of State of Ill., 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) (emphasis added); Smith v. Sec'y for the Dep't of Corr., 572 F.3d 1327, 1347 (11th Cir. 2009) (quoting italicized language).

Finally, the evidence that a laboratory test was performed and Ambien was not detected could have been considered along with other evidence that was damaging to the State's theory that C.W. did not consent.  It is undisputed that C.W. agreed to allow Petitioner to come to her apartment at 2:15 or 2:20 A.M.  Ex. Z, p. 56.  That is a rather unusual hour to agree to a visit with a casual male friend.  It is undisputed that C.W. left the door unlocked, and "took three Tylenol [P.M.s] and a Klonopin."  *Id.*  There is evidence that those medications would have made C.W. relaxed and sleepy.  C.W. then got under the covers in her bed, wearing a sports bra and underwear.  *Id.*  Again, this is not typically the way someone prepares for a visit from a casual friend.  While it was permissible for the jury to have concluded that this was not evidence that C.W. consented to a sexual encounter with Petitioner, it would not have been unreasonable for the jury to have concluded otherwise.

Consequently, there is a reasonable likelihood that the false testimony about testing for Ambien that occurred in this case could have affected the judgment of the jury.  Ventural, 419 F.3d at 1279.  Respondent has not shown that the false evidence about the test for Ambien was harmless beyond a reasonable doubt.  Smith, *supra*, 572 F.3d at 1333-34 (*quoting* Ford v. Hall, 546 F.3d 1326, 1332 (11th Cir. 2008).  Consequently, the petition should be granted as to the Giglio claim.  Even if the standard of review is not *de novo*, the state court's decision on this claim resulted "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

**Ineffective assistance of counsel**

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691, 104 S.Ct. at 2066.  *See also*, Jefferson v. Hall, 570 F.3d 1283, 1301-02 (11th Cir. 2009) (discussing this standard, noting that if any reasonable attorney could have decided in the circumstances that further investigation was unnecessary, deficient performance is not shown and there is no need to examine what additional investigation might have uncovered) (citations omitted).

Petitioner's attorney might have contacted Zeller before trial, though the availability of Zeller prior to trial remains unknown.  But the trial evidence made that failure academic.  Petitioner called an expert in pharmacy to testify for the defense. This witness and the State's witness both said they knew of no "test" for Ambien, and this negative evidence was broad enough to include both a preliminary screen and a more in-depth testing process.  Counsel asked the relevant questions, over the prosecutor's objection, about test results, and whether even absent a specific test the substance should have shown up on the report.  Counsel did not commit attorney error as understood by Strickland.  *See* Gordon v. United States, 518 F.3d 1291 (11th Cir. 2008):

> "There is a strong presumption that counsel's performance was reasonable and adequate."  *Michael [v. Crosby*, 430 F.3d 1310 (11th Cir. 2005], 430 F.3d at 1320.  To overcome that presumption, "a petitioner must establish that no competent counsel would have taken the action

that his counsel did take." *Chandler v. United States*, 218 F.3d 1305,
1315 (11th Cir. 2000) (*en banc*).

518 F.3d at 1301-1302 (emphasis added). The ineffective assistance of counsel claim

was adjudicated on the merits, and the state court's adjudication was not "contrary to, or

involved an unreasonable application of, clearly established Federal law," under §

2254(d)(1).

**Conclusion**

It is therefore respectfully **RECOMMENDED** that the § 2254 petition be

**GRANTED** for the reasons set forth above, and Petitioner's conviction be vacated

unless the State commences a new trial of Petitioner within 60 days of the adoption of

this recommendation.

In the event this recommendation is rejected and the § 2254 petition is denied, it

is **RECOMMENDED** that a certificate of appealability be issued as to Petitioner's claim

under <u>Giglio</u>, that the prosecution allowed false and misleading evidence, and the

prosecution made argument which it should have known was false and misleading in

light of evidence known to the prosecution and law enforcement.

**IN CHAMBERS** at Tallahassee, Florida, on November 17, 2010.

> **s/    William C. Sherrill, Jr.**
> **WILLIAM C. SHERRILL, JR.**
> **UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.