IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

RIK SARGENT,

        Petitioner,

v.                              CASE NO. 4:08cv175-SPM/WCS

WALTER A. MCNEIL,

        Respondent.

_____/

## ORDER DENYING 2254 PETITION FOR WRIT OF HABEAS CORPUS

THIS CAUSE comes before the court on the magistrate judge's report and recommendation dated November 17, 2010.  Doc. 46.  Respondent filed objections (doc. 51), an additional affidavit (doc. 50), and supplemental authority (docs. 52 and 55), which the Court has considered.  At issue is whether the state court's denial of Petitioner's motion for new trial is contrary to or an unreasonable application of federal law.  The motion for new trial cites to closing arguments and testimony elicited by the prosecutor that the victim's urine was not tested for Ambien and that no such test existed.  In fact, the victim's urine was tested for Ambien using gas chromatography, mass spectrometry (GC-MS).  Those test results were disclosed to the defense.  No Ambien was found.

**BACKGROUND**[1]

Petitioner Rik Sargent was convicted in Leon County, Florida on October 29, 2003 of sexual battery on a victim who was physically helpless to resist, in violation of section 794.011(4)(a), Florida Statutes.  The offense requires the victim to be "unconscious, asleep, or for any other reason physically unable to communicate an unwillingness to act."  Fla. Stat. § 794.011(1)(e).  Evidence at trial showed that Petitioner's victim was physically helpless to resist because she had taken medications, including Ambien, before Petitioner had sex with her.

At Petitioner's trial, the victim testified that around 2:15 or 2:20 a.m. she took three Tylenol P.M.s and a Klonopin.  Around 2:30 or 2:35 a.m., when she was already in bed but still awake, Petitioner arrived at her home.  The victim then took an Ambien to fall asleep.  She testified that Petitioner was aware that Ambien would make her forget things and that it would only take 5 or 10 minutes to take effect.

The victim testified that she awoke feeling penetration, then fell unconscious.  She awoke again and went to the bathroom to urinate.  She noticed that her underwear was wet and smelled like semen.  She felt a burning sensation when she urinated, which she said occurs afer she has had sex.  The

---

[1] This background information has been taken from the Report and Recommendation, which more fully describes the trial and subsequent proceedings.  No objections have been made concerning these matters.

victim testified that she was standing in the hall, dazed, and saw Petitioner in her bedroom.  She asked Petitioner about her underwear and why she felt like she had just had sex.  He responded that he did not know.  She asked Petitioner if a rape kit would test negative and he said "probably not."  The victim testified that she asked him why, and Petitioner responded that "he had cum in his boxers."

According to the victim, she yelled for Petitioner to leave.  She crawled back into bed feeling like she was going to pass out.  That was all she remembered before waking up around 1:00 p.m. the following day.

When the victim awoke she went to her computer as she normally does.  Then she noticed she was no longer wearing the sports bra she had gone to sleep with and started to recall events from the night before.  The victim called her friend Tanja and said she thought she had been raped.  She also called her mother and father.  The victim testified that at that point she had not showered or urinated.  The victim's mother drove the victim and Tanja to the hospital.  The victim was examined.  Urine and blood samples were taken from her.  The samples were tested by the Florida Department of Law Enforcement using gas chromatography, mass spectrometry (GC-MS).  GC-MS is a sophisticated test capable of detecting Ambien.  GC-MS is generally not used by clinical laboratories that conduct simple screening for drugs.  Typical screens are much cheaper and will not detect Ambien.

The victim's urine sample was analyzed by Lisa Zeller, a toxicologist from

the Florida Department of Law Enforcement.   Zeller's lab report was supplied to the defense prior to trial.  The report does not state the type of testing performed, nor does it specifically state whether Ambien was tested.  The report does state, however, that sedative-hypnotics were tested.  Ambien is a sedative-hypnotic.

The lab report showed that the victim's urine had amphetamines (related to Aderall, a stimulant the victim took for narcolepsy), seven amino Clonozepam (a breakdown of Klonopin), and dyphenhydramine (Benadryl, which is found in Tylenol P.M.).  The blood report showed Adderall and Benadryl.  Ambien was not detected.  If it had been detected, it would have been listed in the lab report under the generic name Zolpidem.

Neither the prosecutor nor the defense attorney spoke with Zeller prior to trial.  Zeller's lab report was admitted into evidence by stipulation.

At trial, the prosecutor presented the testimony of Dr. Albert Menduni, who was qualified as an expert in internal medicine.  Dr. Menduni had treated the victim for various conditions and testified about her medications and treatment.  Dr. Menduni testified that Klonopin is used for anxiety and as a sedative.  The victim took Klonopin for fibromyalgia and to calm her down from the Adderall that she took for narcolepsy;.  Dr. Menduni explained that Tylenol P.M. is acetaminophen combined with Benadryl.  He stated that if the victim took three Tylenol P.M.s and a Klonopin, she would "mellow out."  If she took an Ambien 20 minutes later, "[t]hat would definitely put her to sleep."  He said she would be

asleep in five or ten minutes and it would be very hard for her to wake up for four hours.

The prosecutor showed Dr. Menduni the lab results for the victim's blood and urine.  The prosecutor referred to the reports as blood and urine screens. When the prosecutor asked Dr. Menduni whether the FDLE screened for Ambien, he said that he knew of no drug screen for Ambien and that the technology used by the FDLE did not screen for Ambien.  Asked if he was aware of a test that would screen for Ambien, Dr. Menduni stated that he had not researched it and did not know.  On cross examination, the defense attorney asked Dr. Menduni if there was a way to verify whether or not someone had taken Ambien.  He stated that he did not know of a way, but he did not research the matter.

Ted Houston, a pharmacist and expert in pharmacology, testified for the defense.  Mr. Houston stated that taking three Tylenol P.M.s, Klonopin, and Ambien would cause a very deep, hard sleep.  He thought it would be possible but very difficult for someone who took those medications to get up and walk across the room, sit on a toilet, or speak four or five sentences in conversation. Without the Ambien, he thought a person could be awakened.

Mr. Houston stated that he did not see anything in the list of substances in the FDLE urine test that looked like Ambien.  He agreed with Dr. Menduni's testimony that there was no test for Ambien, but stated that Ambien could show

up as an unknown substance not normally in a person's urine or blood.

On cross examination, Mr. Houston acknowledged that he had never worked for the FDLE.  When the prosecutor read aloud from the bottom of the urine test the list of drugs and drug classes included in the analysis, Mr. Houston stated that Ambien was not listed.  Mr. Houston also said he was not aware of a test to identify Ambien.

When the defense attorney asked on redirect whether the point of the FDLE test is to show any unidentified substance not normally found in the urine or blood, the prosecutor objected.  Over the prosecutor's objection, Mr. Houston testified that although he did not know about the FDLE test specifically, with drug testing generally if there is anything foreign in the sample its presence would be shown even if it were not specifically being tested.  He said he thought Ambien would show up as either Ambien or Zolpidem.

In closing argument, the defense attorney stated:

And it may very well come down to whether or not that Ambien was taken, whether or not there is evidence beyond a reasonable doubt that that Ambien was taken. . . . There is no independent evidence of that.  And while I think every single expert that did testify testified that there is no specific test for Ambien, it would, however, show up as an unidentified substance.  And it is not there.  And again, if [the victim] is not credible about taking Ambien, then how can she be credible with anything else that she said?

The prosecutor argued in rebuttal:

[The victim's] testimony has been corroborated in every single way that it can.  In every single way. . . . Mr. Houston is not familiar with

the test-running at FDLE.  Dr. Menduni told you that the screen
they ran would not find Ambien.  There is nothing that says that if
Ambien was in her system, the screen they ran at FDLE would
show that.  And Dr. Menduni and even Mr. Houston agreed there is
no test to determine whether Ambien is in your system.  So could
the State have presented that evidence to you?  And the answer is
no.  There is no test.  But everything else she said she takes is right
there.  That corroborated her statement.

The jury found Petitioner guilty.  Prior to sentencing, Petitioner filed a

motion for new trial.  In the motion, defense counsel stated that she spoke with

toxicologist Lisa Zeller after trial and learned that Ambien can be detected

through FDLE tests and that the victim's urine was tested for Ambien.  The

motion contains argument that the state violated its obligation under Brady by

failing to reveal these exculpatory facts.  The motion also contains argument that

the prosecutor had an obligation to correct the testimony of Dr. Menduni that

there was no test for Ambien.  The trial court denied Petitioner's motion and

noted that the defense "could have presented direct evidence that [the victim]

didn't consume medication."  Ex. BB, pp. 30-31.  Petitioner raised the same

arguments on direct appeal, which was affirmed without opinion.

 Petitioner filed a motion for post-conviction relief under Florida Rule of

Criminal Procedure 3.850.  The motion alleged ineffective assistance of counsel.

It was denied without an evidentiary hearing.  The court found that evidence of

Petitioner's guilt was overwhelming and evidence that the victim did not take

Ambien was not exculpatory.  On appeal, the ruling was affirmed without opinion.

**SECTION 2254 CLAIMS**

Petitioner raised two grounds for relief in his section 2254 motion.  In ground one, he argues that the trial court erred in denying his motion for new trial based on the prosecutor's failure to disclose that the samples were tested for Ambien, as required by Brady.  His claim includes the prosecutor's failure to correct false testimony, although he does not cite Giglio.  In ground two, Petitioner claims that his counsel was ineffective for failure to investigate and discover exactly what the FDLE tested for and what the results meant.

In the Report and Recommendation, the magistrate judge recommends denying Petitioner's ineffective assistance of counsel claim.  No objections have been made to this portion of the Report and Recommendation.  On de novo review, the Court agrees that the state court's denial of this claim should stand.  Petitioner's counsel performed an adequate investigation of the test results by calling an expert in pharmacy to testify for the defense.  The defense counsel asked appropriate questions.  Defense counsel cannot be faulted for failure to determine that there was in fact a test for Ambien when the defense expert and the State's expert both took the position that there was no test for Ambien.

As for Petitioner's first ground, the magistrate judge recommend denying relief under Brady, because the lab report was provided to the defense and the defense had an equal opportunity to discover that the samples had been tested for Ambien.  No objections have been made to this portion of the Report and

Recommendation.  On de novo review, the Court agrees.  The government is not required under Brady to provide evidence that can be obtained from other sources through the exercise of reasonable diligence.  United States v. White, 846 F.2d 678, 692 (11th Cir. 1988).

The magistrate judge found, however, that Petitioner was entitled to relief under Giglio based on the use of false testimony to obtain the conviction. Respondent objects on six grounds.  These are, first, that the petition is untimely. Second, that the Giglio issue was not fairly raised.  Third, that the magistrate judge did not give proper deference to the state court's legal and factual findings. Fourth, that there is no Giglio violation because no perjury was committed and Petitioner had an opportunity to present evidence that the victim's urine tested negative for Ambien.  Fifth, that the FDLE toxicologist is not part of the prosecution team for purposes of imputing knowledge upon the prosecutor. Sixth, that the false evidence was not material.

**ANALYSIS**

### 1.    Petition is timely with application of mail box rule

Respondent reiterates an argument previously made that Petitioner should not benefit from the mail box rule for the filing of his 3.800(a) motion in the state court because he did not comply with the rule for inmate legal mail.  See docs. 5, 7, 9-11.  The Court stands by its previous ruling that the mail box rule applies and that the 3.800(a) motion tolled the time for filing the 2254 petition.

### 2.     Giglio issue was fairly raised

Respondent argues that the 2254 petition does not fairly raise a <u>Giglio</u> claim, and if it does the claim was procedurally defaulted.  The facts supporting the <u>Gigilo</u> claim and the legal basis were fairly presented before the state court and before this Court.  The claim was not procedurally defaulted.

Petitioner fairly presented his <u>Gigilo</u> claim by complaining of the prosecutor's non-disclosure of the GC-MS testing for Ambien as a violation of <u>Brady</u>, and noting specifically that the prosecutor presented false testimony and argument that the victim's urine was not tested for Ambien.  <u>See</u> <u>Ogole v. Johnson</u>, 488 F.3d 1364, 1369 (11th Cir. 2007) (issue of ineffective assistance of counsel fairly presented when petitioner made general allegation of ineffective assistance and also called the specific instances to the attention of the court). Petitioner was not required to separate his claims into distinct <u>Brady</u> and <u>Gigilo</u> grounds.

"<u>Giglio</u> error is a species of <u>Brady</u> error that occurs when 'the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew or should have known of the perjury.'" <u>Ventura v. Attorney Gen., Fla.</u>, 419 F.3d 1269, 1276-77 (11th Cir. 2005) (quoting <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976)).  Both <u>Brady</u> and <u>Giglio</u> share the same foundation in due process to safeguard confidence in the outcome of trial by imposing a duty on the prosecution to disclose material evidence.  <u>United</u>

States v. Bagley, 473 U.S. 667, 680 and n.8 (1985) (discussing origins of Brady and different standards of materiality).  Without a duty on the part of the prosecution to expose the truth, "the adversarial system of prosecution . . . desend[s] to a gladiatorial level" and the trial process ceases to function "as the chosen forum for ascertaining the truth about criminal accusations."  Kyles v. Whitley, 514 U.S. 419. 439-440 (1995).

The main differences between Giglio and Brady are the kind of non-disclosure involved and the standard of materiality to establish a claim.  Ventura, 419 F.3d at 1278; Smith v. Sec'y, Dep't of Corrections, 572 F.3d 1327, 1333 (11th Cir. 2009).  A general Brady claim "occurs when the government suppresses evidence that is favorable to the defense, although the evidence does not involve false testimony or false statements by the prosecution."  Smith, 572 F.3d at 1334.  Under the general Brady standard, undisclosed evidence is deemed material to require a new trial "if there is a reasonable probably that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Bagley, 473 U.S. at 682.  Under Giglio, a more defense-friendly standard applies when the non-disclosure involves false testimony that was used to obtain a conviction.  A new trial is required ""if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.""  Ventura. (quoting United States v. Agurs, 427 U.S. 97, 103 (1976).

In his post-trial motion for new trial in state court, Petitioner cited Craig v.

State, 685 So. 2d 1224 (Fla. 1996) for the proposition that "a prosecutor has the obligation to correct testimony presented by a witness if the prosecutor knows the testimony is false, and the testimony is material." Ex. C, p. 106. Craig is a Florida Supreme Court case applying Giglio. On appeal, Petitioner included a citation to Giglio.

In his petition filed with this court, when Petitioner argued about the prosecution's non-disclosure, he cited to the failure of the prosecution to disclose that the victim's urine had been tested for Ambien and that the results were negative. He also complained of non-disclosure regarding the false testimony and arguments from the prosecutor that there was no test for Ambien. Factually and legally, the Brady and Giglio claims are related and were not required to be raised as separate claims. Petitioner fairly presented both claims by stating the factual foundation and legal basis for each claim.

### 3.     AEDPA deference

In a decision issued after the magistrate judge's report and recommendation, the United States Supreme Court clarified that a state court decision denying relief on the merits is entitled to AEDPA deference even when the state court provides no explanation for its decision. Harrington v. Richter, 131 S.Ct. 770, 784-85 (2011). A claim will be presumed to have been adjudicated on the merits in the absence of any indication that the adjudication

was based on a procedural ground or other reason.  Id.  In this case, there is no

indication that the state court did not render a decision on the merits of

Petitioner's Giglio claim.  Therefore, the decision is entitled to deference.

Applying deference under the AEDPA means that federal habeas relief will

not be granted unless the state court decision was "(1) . . . contrary to, or

involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States; or (2) . . . based on an

unreasonable determination of the facts in light of the evidence presented in the

State court proceeding."  28 U.S.C. § 2254(d).   Because the facts underlying

Petitioner's Gigilo claim are undisputed, the second part of the AEDPA deference

standard is not at issue.  Instead, the focus is on whether the state court decision

denying relief to Petitioner was contrary to or an unreasonable application of

clearly established Federal law.

In applying this standard, the Court should first determine "the governing

legal principle or principles set forth by the Supreme Court at the time the state

court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).

Next, the Court must determine whether the state court adjudication is "contrary

to" that law, either because "'the state court applies a rule that contradicts the

governing law . . .' or because 'the state court confronts a set of facts that are

materially indistinguishable from a decision of th[e] [Supreme] Court and

nevertheless arrives at a different result from [Supreme Court] precedent.'" Id.

(quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  If the state court

decision is not contrary to the law, the Court must then determine whether the

decision involved an "unreasonable application" of the law.  Whether a state

court decision was an unreasonable application of the law must be assessed in

light of the record the state court had before it.  Holland v. Jackson, 542 U.S.

649, 652 (2004).  The Court should "determine what arguments or theories . . .

could have supported" the denial of relief to Petitioner and "whether it is possible

fairminded jurists could disagree that those arguments or theories are

inconsistent with the holding in a prior decision of [the Supreme Court]."

Harrison, 131 S.Ct. at 786.  Decisions of lower federal courts may be considered

to the extent that they demonstrate how those courts applied Supreme Court

holdings.  Hawkins v. Alabama, 318 F.3d 1302, 1309 (11th Cir. 2003).

### 4.    Testimony did not cause Giglio violation

Respondent argues that the governing standard for Petitioner's Giglio

claim requires perjured testimony.  According to Respondent, the testimony given

by Dr. Menduni in this case was possibly mistaken, but it was not perjury.

Respondent also argues that Dr. Menduni's testimony was arguably correct

because there is no clinical test for Ambien and Dr. Menduni was never asked if

Ambien metabolites could be detected using GC-MS.  Respondent also argues

that there was no impediment to Petitioner's ability to present evidence at trial of

the GC-MS test for Ambien in the victim's urine and that Petitioner's own expert, Mr. Houston, testified that there was no test for Ambien.

Turning to Respondent's argument that perjury is required to establish a claim under Giglio, the argument has support in Supreme Court precedent.  In Strickler v. Greene, the Court applied the more stringent Brady standard for materiality when the prosecution presented misleading testimony from an eye-witness about the reliability of her memory.  527 U.S. 263, 273, 280 (1999).  The eye-witness testified in great detail about the abduction of the victim from a mall, including the license plate number of the car that the defendant forced the victim into.  Id. at 272-73.  The eye-witness testified that she had "an exceptionally good memory."  Id. at 272.  She testified that the defendant "caught [her] attention and [she] paid attention" and that she had "absolutely no doubt about her identification."  Id. at 273.

Undisclosed information from police interviews with the eye-witness, however, revealed that the eye-witness could not identify the defendant or the victim when first interviewed by police, that she had stated she had only a "vague memory" of events and needed her daughter to help jog her memory, and that she could not identify the victim until she spent several hours looking at photographs with the victim's boyfriend.  Id. at 273-73.  The Court noted that the prosecution has a duty to learn information possessed by police investigators and has a duty to avoid perjured testimony.  Id. at 280-281.  The Court

acknowledged that the information "cast serious doubt on the [eye-witness's] confident assertion of her 'exceptionally good memory.'" <u>Id.</u> at 273. Nevertheless, the Court applied the general <u>Brady</u> standard for materiality rather than the more defense-friendly <u>Gigilo</u> standard.  Although no explanation is provided, it appears that the Court determined that the eye-witness's testimony was not perjury, even if it presented a false impression to the jury.

The Eleventh Circuit Court of Appeals expressly applies a perjury standard for <u>Giglio</u> claims.  "To establish prosecutorial misconduct for the use of false testimony, a defendant must show the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material."  <u>United States v. McNair</u>, 605 F.3d 1152, 1208 (11th Cir. 2010).  This means that the false testimony must be given with "willful intent" and "not as a result of mistake, confusion, or faulty memory."  <u>Id.</u>

In this case, while Dr. Menduni's testimony left the jury with the impression that Ambien could not be tested, there is no indication of a willful intent to mislead the jury.  Dr. Menduni testified that he had not researched the issue and he did not know if there was a screen to test for Ambien.  He was not asked if a GC-MS test could reveal Ambien.  Mr. Houston, the defense expert, had similar confusion of the test used by FDLE.  He stated that there was no test for Ambien, although he believed Ambien would show up as an unusual substance.  The testimony by both experts shows mistake or confusing regarding the test used by

the FDLE.  The testimony does not show any willful intent to mislead as required

under Giglio.  Therefore, the state court's denial of Petitioner's Gigilo claim is not

contrary to, or an unreasonable application of, clearly established Federal law.

Additionally, because the prosecution did not suppress any evidence in

this case, Respondent argues that there is no Giglio violation since Petitioner had

the opportunity to cross-examine the State's expert and present his own

evidence regarding the FDLE test.  It must be remembered that "Giglio error is a

species of Brady error that occurs when 'the undisclosed evidence demonstrates

that the prosecution's case included perjured testimony and that the prosecution

knew or should have known of the perjury.'" Ventura, 419 F.3d at 1276-77

(quoting United States v. Agurs, 427 U.S. 97, 103 (1976)).  In this case, there

was no undisclosed evidence because the defense had the lab report.  Ward v.

Hall, 592 F.3d 1144, 1183 (11th Cir. 2010) (There is no suppression of

exculpatory evidence if the defendant knows of the information or had equal

access to obtaining it.).  Since the lab report was provided to the defense,

arguably there is no Giglio claim.  See Hammond v. Hall, 586 F.3d 1289, 1309

(11th Cir. 2009) (Giglio claim fails because information not suppressed).

Furthermore, with regard to the prosecutor's closing arguments, although

the Eleventh Circuit has extended the requirements of Giglio to a prosecutor's

"explicit factual representations . . . at sidebar and implicit factual representations

to the jury during cross examination" (United States v. Alzate, 47 F.3d 1103,

1110 (11th Cir. 1995), <u>Giglio</u> has not been extended to closing arguments.  The

clearly established Federal law for prosecutorial misconduct during closing

argument applies a different standard.  <u>See</u> <u>Spencer v. Sec'y, Dep't of Corr.</u>, 609

F.3d 1170, 1182 (11th Cir. 2010).  Petitioner has not argued this standard in his

2254 petition.

**5.      Toxicologist is not part of the prosecution team under <u>Giglio</u>**

Respondent argues that Petitioner's <u>Giglio</u> claim must fail for the

additional reason that toxicologist Lisa Zeller, who possessed the information

about the GC-MS testing of the victim's urine and negative result for Ambien, is

not a member of the prosecution team for purposes of imputing knowledge of

false testimony on to the prosecutor.  As Respondent notes, Supreme Court

holdings have never imputed knowledge of false testimony to the prosecutor from

state expert witnesses or even police officers.  <u>See</u> <u>Rhodes v. Sec'y, Dep't of

Corr.</u>, No. 8:09-cv-1350-T-17TBM, 2010 WL 3819358 at *15 (M.D. Fla. Sept. 30,

2010).   The prosecutor's knowledge of the false testimony is required for a

successful <u>Giglio</u> claim.  Because Petitioner's claim relies on a theory that is not

clearly established by Federal law, he has not demonstrated that he is entitled to

Federal habeas relief.

**6.      False evidence not material**

Finally, Respondent argues that the false evidence was not material.  On

this issue, the Court agrees with the magistrate judge's analysis in the Report

and Recommendation.  Doc. 46, pp. 55-61.  The Court finds, however, that

Petitioner is not otherwise entitled to relief on his Giglio claim because there was

no false testimony, no suppression of evidence, and no violation of clearly

established Federal law.

**CONCLUSION**

Petitioner's 2254 habeas petition will be denied as to all claims.  The Court

adopts the magistrate judge's report and recommendation for denial of the Brady

claim and denial of the ineffective assistance of counsel claim.  The Court rejects

the recommendation for relief on the Giglio claim.

The magistrate judge's recommendation for relief on the Giglio claim

demonstrates that reasonable minds could differ and that Defendant has made a

substantial showing of the denial of a constitutional right.  Accordingly, this Court

will issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c) for the

Giglio claim.  Accordingly, it is

ORDERED AND ADJUDGED:

1.      Petitioner's § 2254 habeas petition (doc. 1) is denied.

2.      The Court certifies that Petitioner may appeal this order as to his

Giglio claim, pursuant to 28 U.S.C. § 2253(c).

3.      Petitioner's motion for release pending appeal (doc. 53) is denied.

4.      Respondent's unopposed second motion to expand record (doc.

50) is granted.

DONE AND ORDERED this 10th day of May, 2011.


*s/ Stephan P. Mickle*
Stephan P. Mickle
Chief United States District Judge